EL PUEBLO DE PUERTO RICO, apelado, *v.* MARINA GONZÁLEZ ROMÁN, acusada y apelante.

*Número:* CR-93-46          *Resuelto:* 20 de junio de 1995

*Fleming Castillo Alfaro*, de la *Sociedad para Asistencia Legal*, abogado de la apelante; *Pedro A. Delgado Hernández, Procurador General*, y *Eunice Amaro Garay, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso es una secuela de la opinión y sentencia que emitimos en *Pueblo v. González Román*, 129 D.P.R. 933 (1992). En ese caso resolvimos que, como durante el juicio había surgido tanto evidencia sobre los elementos de legítima defensa como un caso prima facie de maltrato conyugal, era admisible el testimonio pericial sobre el síndrome de la mujer maltratada como complemento de legítima defensa. Devuelto el caso al Tribunal Superior y recibido el testimonio pericial, el Jurado rindió un veredicto de culpabilidad contra Marina González Román por los delitos de homicidio e infracción al Art. 4 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 414. Oportunamente, la señora González Román apeló el veredicto y sostiene que hirió de muerte a su esposo en un forcejeo para defender su vida de un ataque perpetrado por éste con un cuchillo y en estado de embriaguez. Por entender que la totalidad de la prueba estableció los requisitos necesarios para aplicar la legítima defensa, revocamos la sentencia apelada.

# I

El caso de autos trata sobre un trágico incidente ocurrido en el ámbito de un humilde hogar donde la señora González Román, en un conflicto doméstico, dio muerte a su esposo, Jorge René Rivera, con un cuchillo de cocina. Como consecuencia de este suceso, el Ministerio Público presentó acusaciones contra la señora González Román por los delitos de homicidio e infracción al Art. 4 de la Ley de Armas de Puerto Rico, *supra.*

Según se desprende de la extensa transcripción de evidencia presentada ante este Foro, el Ministerio Fiscal presentó entre sus testigos al agente de la Policía de Puerto Rico, Diego Figueroa.([1]) El agente testificó que el 10 de diciembre de 1990 inició la investigación sobre la muerte de Jorge René Rivera en el barrio San Antonio de Caguas, sector El Salchichón, y que se entrevistó con la apelante Marina González Román, esposa del occiso. Explicó que, luego de hacerle las advertencias de rigor y de asegurarse de que ella las había comprendido, la señora González Román le informó que el 9 de diciembre de 1990 estuvo con sus hijos Jorge, de nueve (9) años, y Waleska, de ocho (8) años, en una fiesta de bautizo. A eso de las siete y media de la noche (7:30 P.M.) su esposo llegó a la fiesta. Transcurrió un tiempo y alrededor de las diez de la noche (10:00 P.M.) ella fue a llevar a sus hijos a casa de sus suegros y regresó a la fiesta. Estuvo allí hasta las doce (12:00) de la noche, cuando se fue a su casa y se acostó a dormir.

---

([1]) El Ministerio Fiscal presentó como testigos de cargo a Diego Figueroa Torres, agente de la Policía que se personó al lugar de los hechos para iniciar la investigación sobre la muerte de Jorge René Rivera; a Antonio Rivera, padre del occiso; a Elsie Colón, vecina y amiga de crianza del occiso; a Adalberto Reyes Flores, conocido del occiso; a José A. Rivera, agente de la Policía quien recibió la querella y se personó al lugar de los hechos con el padre del occiso; a Luis Álamo Estrada, cliente del negocio "El Cantinflas"; a Francisco Cortés Rodríguez, patólogo forense, y una declaración jurada de Rubén Colón Merced, muerto al día del juicio. La defensa, por su parte, presentó como testigos a Ángel González Román, hermano de la apelante; a Úrsula Colón, perito sobre el síndrome de la mujer maltratada, y a Esdras Nives Ríos, administrador del negocio "El Cantinflas".

Luego, alrededor de las cuatro (4) de la mañana, su esposo llegó borracho y le comenzó a dar martillazos a la puerta del cuarto matrimonial, donde ella estaba durmiendo, para que le abriera. Al ella abrir la puerta, él entró con un cuchillo en la mano y la cogió por el cuello. Se produjo un forcejeo entre ellos y su esposo resultó herido con el cuchillo.(2) Una vez ella repelió la agresión, él salió del cuarto y ella se volvió a acostar. Cuando se levantó al otro día, encontró a su esposo muerto en uno de los cuartos de la pequeña casa.

A preguntas de la defensa, el agente Figueroa declaró que el occiso tenía una sola herida en el abdomen y que no encontró rastros de sangre en la habitación matrimonial, sino que habían gotas de sangre frente a la puerta de dicho cuarto en el piso y seguían hasta el balcón. Además, testificó que la puerta de la habitación del matrimonio tenía una hendidura visible en la parte central superior, lo cual es compatible con el recuento de los hechos que hizo la señora González Román en cuanto a los martillazos que dio su esposo en dicha puerta.(3)

También, como testigo de cargo, declaró el padre del occiso, Antonio Rivera Martínez. Éste testificó que su hijo y la señora González Román llevaban diez (10) años conviviendo y que tenían dos (2) hijos, Waleska y Jorgito. A preguntas sobre el hecho de que la víctima tenía .31 de alcohol en la sangre al momento de su muerte, el testigo expresó

---

(2) El agente Figueroa declaró que, luego de que se determinó causa probable por el delito de homicidio contra la apelante, surgió una confidencia de que los hechos no habían ocurrido como los relató la acusada. El Ministerio Fiscal presentó unos testigos que introdujeron una prueba que resultaba conflictiva con el recuento de los hechos que le hizo la apelante al agente Figueroa. En específico, hubo una prueba conflictiva sobre quién llegó primero a la casa la madrugada cuando murió la víctima.

A los efectos del resultado al cual llegamos hoy, es impertinente quién llegó primero a la casa la madrugada de 10 de diciembre de 1990. Lo que sí es de gran importancia es que hubo prueba contundente de que hubo un forcejeo, que éste no fue provocado por la apelante y que, como resultado, la víctima murió.

(3) El Policía José A. Rivera, testigo de cargo, también declaró que cuando inspeccionó la residencia de la apelante observó que la puerta del cuarto matrimonial tenía una hendidura en la parte central superior.

que no le sorprendía, pues eso era normal en su hijo. Además, declaró que cuando su hijo bebía acostumbraba pelear con su nuera.

A preguntas de la defensa, el padre del occiso respondió que veía a su hijo y a su nuera todos los días, pues ella ayudaba a su esposa con su hija lisiada y en otros quehaceres del hogar. Declaró, además, que en varias ocasiones la señora González Román llegó a su casa llorando por las agresiones que su hijo le infligía y que éstas eran aparentes.

Por su parte, Luis Álamo Estrada, otro testigo de cargo, declaró en el contrainterrogatorio de la defensa que conocía al occiso de toda la vida, pues se habían criado juntos y que éste era una persona violenta.

El doctor Cortés Rodríguez, testigo de cargo y patólogo forense quien practicó la autopsia en el cadáver, testificó, en lo pertinente, que éste presentaba una herida elíptica al lado izquierdo del ombligo con una trayectoria de abajo hacia arriba y de delante hacia atrás. El arma penetró el abdomen y le laceró el intestino y el mesenterio, causándole la muerte. Además, estableció que la herida fue causada por un cuchillo como el que le entregó la señora González Román al Fiscal que investigó el suceso.

Por otro lado, el doctor declaró que el resultado del examen toxicológico de sangre reflejó un .31 de alcohol, y que el examen del hígado reflejó una condición compatible con cirrosis hepática. Atestiguó, además, que la herida era compatible con una persona que hubiese estado de frente al occiso y que fuese cuatro (4) o cinco (5) pulgadas más pequeña que él.([4]) El testigo indicó que el tipo de herida

---

([4]) A continuación transcribimos el segmento del interrogatorio directo por parte del Ministerio Público al patólogo forense, del cual se desprende que la herida del occiso era compatible con una persona que hubiese estado frente a él:

"P. Le pregunto si esa herida es compatible a una persona que haya estado de frente y le haya dado ese tipo de movimiento en el brazo.

"R. Sí, señor.

recibida por el occiso era compatible con una herida producida en un forcejeo.([5])

Como testigo-perito, la defensa presentó a Úrsula M. Colón, consultora independiente de relaciones de familia con una especialidad en el área de violencia doméstica. Ante la oposición del Ministerio Público, el foro de instancia emitió una resolución mediante la cual no le permitió a la defensa presentar la prueba sobre el síndrome de la mujer maltratada, por medio de esta testigo-perito. La defensa recurrió ante nos en *certiorari* de dicha resolución. Mediante la opinión emitida el 4 de febrero de 1992, revo-

---

"P. Si es compatible con una persona que sea cuatro pulgadas, cinco pulgadas, tres pulgadas más pequeña que don Jorge René.

"R. Sí, es compatible con eso." T.E., págs. 240–241.

([5]) A continuación transcribimos un segmento del contrainterrogatorio por parte de la defensa al patógo forense, del cual se desprende que la forma de la herida era compatible con una que haya sido producida como resultado de un forcejeo:

"P. Sí. O sea, la pregunta que yo le estoy haciendo es ...

"R. Anjá.

"P. ... hay dos personas luchando, dos personas luchando: una de ellas trae un cuchillo y en un forcejeo ese cuchillo se vira y se puede producir esa herida, esa herida de forma elíptica que usted ha definido.

. . . . . .

"R. Es, básicamente, elíptica la herida que se produce cuando hay ese tipo de cambio en la, en la trayectoria.

"P. En un forcejeo.

"R. Sí, por supuesto.

"P. Por supuesto.

Yo no tengo más preguntas. Muchas gracias, doctor." Transcripción de evidencia, pág. 243.

A continuación la respuesta del patológo forense a la pregunta final de la defensa sobre si se puede producir una herida de forma elíptica como resultado de un forcejeo:

"Lcdo. Bermudez Melendez:

"P. Mire, para estar claro, esa herida elíptica que usted la define así: herida elíptica, ¿puede ser producto de un forcejeo también cuando...

"Fiscal Alcover:

Es repetitivo, Señor Juez...

"Hon. Juez:

Ya, ya, ya dijo, ya dijo que era posible, este...

"Lcdo. Bermudez Melendez:

"P. ¿Es posible o no es posible?

"R. Es posible.

"P. Es posible. Gracias, eso es todo." T.E., pág. 247.

camos la resolución y permitimos el testimonio pericial sobre el síndrome de la mujer maltratada. *Pueblo v. González Román,* supra.

Devuelto el caso al Tribunal Superior para la continuación de los procedimientos, la señora Colón testificó que había evaluado a la señora González Román y que ésta era un caso típico de una mujer maltratada.[6] Declaró que ésta era agredida con frecuencia por su esposo. Expresó que el occiso amenazaba a la señora González Román frecuentemente con quitarle la vida. La había amenazado con machetes, cuchillos y palos y, en un momento dado, le dio un puño de tal magnitud que al día del juicio la apelante todavía tenía un diente flojo. También estableció que el occiso tenía problemas de bebida y que su nivel de violencia aumentaba en la medida que bebía.

Con respecto a la situación particular de la señora González Román, Úrsula Colón manifestó que ésta era una mujer maltratada, quien sufría de un sentido de desvalidez que no le permitía contemplar otras alternativas a su modo de vida. En los momentos en que ella sí buscó algunas alternativas que estaban a su alcance, recurrió a su hermano para tratar de romper la relación con su cónyuge. Pero le era muy difícil, pues el occiso la seguía y le prometía cambiar. Hablaba, incluso, con el hermano de ella y le prometía que no volvería a agredirla.

La señora González Román explicó que las veces cuando recurrió a su suegro para pedirle que interviniera y hablara con su hijo, éste le hacía caso omiso. Inclusive, éste declaró que nunca la llevó al cuartel a presentar una querella en contra de su hijo por violencia doméstica, a pesar de que era consciente de lo que ocurría y sabía que la señora González Román no tenía un automóvil para poder llegar al cuartel y él sí tenía uno. Además, la testigo afirmó

---

[6] Para una definición de los términos "mujer maltratada" y "síndrome de la mujer maltratada", véase *Pueblo v. González Román,* 129 D.P.R. 933 (1992), y la opinión concurrente que emitió la Hon. Juez Asociada Señora Naveira de Rodón en dicho caso.

que la señora González Román vivía en un constante temor de que, durante el transcurso de la caminata desde su casa hasta un cuartel o al teléfono más cercano para reportar las agresiones de su marido, él se enterara de su intención de reportarlo y tomara represalias contra ella, que es lo común en los casos de violencia doméstica. Es por ello que, realmente, la señora González Román no podía visualizar ninguna alternativa.

A preguntas de la defensa sobre la actuación de la señora González Román el día de los hechos, la testigo estableció que el ciclo de violencia al cual estaba sometida la apelante le había enseñado a reconocer cuándo el grado de violencia de su esposo se tornaba totalmente fuera de control. Señaló la señora González Román que esa madrugada el occiso llegó borracho y violento; le dio con un martillo a la puerta del cuarto, y la trató de agredir con un cuchillo. Entonces fue que surgió un forcejeo y ella tuvo que defender su vida. La actuación de la señora González Román, según la testigo, respondió en su totalidad al instinto de supervivencia. El propósito de su actuación fue única y exclusivamente defender su vida. Luego, en el contrainterrogatorio del Ministerio Fiscal, la testigo señaló que la señora González Román le contó que el sábado anterior a los hechos, había sido agredida por el occiso.

Por otro lado, Ángel González Román, hermano de la apelante, testificó que la primera vez que vio a su hermana golpeada por el occiso ésta llegó a casa de su madre con moretones en la cara y en el cuerpo. Expresó que no recordaba la fecha exacta porque la había visto agredida en varias ocasiones a lo largo de su matrimonio con éste. Indicó, además, que habló con él sobre los golpes de su hermana.

Concluidos los testimonios de cargo y de la defensa, el Jurado, compuesto por diez (10) hombres y dos (2) mujeres, emitió un veredicto de culpabilidad por mayoría de diez (10) a dos (2) por los delitos imputados. Posteriormente, el tribunal a quo sentenció a la señora González Román a

seis (6) años de reclusión· por el delito de homicidio y seis (6) meses por infracción a la Ley de Armas de Puerto Rico, que habían de ser cumplidos de forma concurrente y bajo el régimen de sentencia suspendida.

En su apelación, la señora González Román solicita que revoquemos la sentencia dictada por el foro de instancia porque se cometieron varios errores de derecho. Principalmente, plantea que erró el Jurado al rendir un veredicto de culpabilidad, cuando la propia prueba del Ministerio Público estableció todos los elementos requeridos para demostrar que ella actuó en legítima defensa.

## II

El Art. 22 del Código Penal, 33 L.P.R.A. sec. 3095, dispone sobre la legítima defensa, una de las causas de exclusión de responsabilidad. Dicho artículo establece, en lo pertinente, que:

> No incurre en responsabilidad el que defiende su persona, sus bienes o derechos, o su morada, o la persona, bienes o derechos, o morada de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente siempre· que hubiere necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación suficiente del que ejerce la defensa, y no se inflija más daño que el necesario al objeto.
>
> Para justificar el dar muerte a un ser humano, cuando se alegue legítima defensa, es necesario tener motivos fundados para creer que al dar muerte al agresor se hallaba el agredido o la persona defendida en inminente o inmediato peligro de muerte o de grave daño corporal.

Para que prospere la legítima defensa, hemos exigido tradicionalmente la concurrencia de varios requisitos: primero, que el acusado demuestre que tenía motivos fundados para creer que estaba en inminente peligro de muerte o de grave daño corporal; segundo, que haya la necesidad racional del medio utilizado para impedir o repeler el daño; tercero, que no haya provocación de parte de

quien invoque la defensa, y cuarto, que no infligió más daño que el necesario para repeler o evitar la agresión. *Pueblo v. De Jesús Santana*, 100 D.P.R. 791 (1972); *Pueblo v. Ríos Rivera*, 88 D.P.R. 165 (1963); *Pueblo v. Lozada*, 37 D.P.R. 927 (1928).

En *Pueblo v. Martínez Solís*, 128 D.P.R. 135 (1991), interpretamos de manera más liberal el estatuto de legítima defensa, al permitir la presentación de evidencia sobre unos actos previos específicos de la víctima. En dicho caso, el acusado había intentado justificar su conducta al matar a la víctima en legítima defensa, a la luz de su estado mental. La presentación de evidencia sobre unos actos específicos previos de la víctima tuvo el propósito de demostrar su carácter y, por ende, la razonabilidad de la conducta del acusado, conforme al temor que le pudo producir la confrontación con dicha persona, dado el conocimiento que el acusado tenía de su carácter.

Asimismo, en *Pueblo v. González Román*, supra, admitimos prueba pericial sobre el síndrome de la mujer maltratada como complemento de la legítima defensa. Allí expresamos que el propósito de este testimonio es ayudar al juzgador de los hechos a entender el efecto que tiene el maltrato del compañero agresor sobre el diario vivir de su víctima.[7]

El síndrome de la mujer maltratada ha sido definido como el conjunto de características específicas que

---

[7] El testimonio pericial sobre el síndrome de la mujer maltratada es indispensable en estos casos, porque instruye al juzgador sobre el diario vivir de toda mujer maltratada, en el cual impera un temor constante al próximo ataque violento que podría causarle la muerte. Es, en otras palabras, útil porque ilustra al juzgador sobre

"... experiencias comunes a todas las mujeres maltratadas, explicar el contexto en el que una mujer maltratada actúa y brindarle credibilidad a sus acciones .... El testimonio es útil porque (en teoría) contesta las preguntas que están en las mentes de todo juzgador, preguntas como por qué la mujer no se fue de la casa, por qué no reportó la agresión a la policía y, más importante aún, por qué pensaba que el peligro que estaba a punto de enfrentar era de vida o muerte." Schneider, *Women's Self-Defense Work and the Problem of Expert Testimony on Battering*, 61–63 (1986).

suelen reunir las mujeres víctimas de un maltrato que se desarrolla en forma cíclica y repetitiva. Sin embargo, dicho síndrome no constituye una defensa absoluta que exima de responsabilidad a la mujer que lo invoque. Su aplicación se circunscribe a los casos en los cuales la actuación de la mujer, que sea víctima de un ciclo de violencia, no caiga dentro del marco tradicional de la legítima defensa, por la aparente inaplicabilidad de los requisitos de inminencia y razonabilidad que exige el Art. 22 del Código Penal, *supra.*

■ Este síndrome aplica particularmente a los casos en que la mujer maltratada no mata a su compañero-agresor mientras éste la está agrediendo, sino que lo hace en un período de relativa calma. Ello es así porque, cuando esto ocurre, el posible cumplimiento con los elementos tradicionales de la legítima defensa no es evidente. Véanse: W. Steele Jr. y C.W. Sigman, *Reexamining the Doctrine of Self Defense to Accomodate Battered Women*, 18 Am. J. Crim. Law 169, 179 (1991); *Developments in the Law: Legal Responses to Domestic Violence*, 106 Harv. L. Rev. 1498, 1577 (1993); A. Toro Lavergne, *Cuando las mujeres matan a los hombres ... una crítica al síndrome de la mujer maltratada y su aplicación en Puerto Rico*, 63 Rev. Jur. U.P.R. 573, 583 (1994).

■ Sin embargo, esta modalidad de la defensa propia se invoca también con frecuencia cuando la mujer, víctima de violencia doméstica, da muerte a su compañero durante el transcurso de un ataque por parte de éste, en el cual ella no fue amenazada con un arma mortal.([8]) En estos últimos

---

([8]) Ello pretende combatir la percepción general, consistente en que las confrontaciones físicas ocurridas dentro del contexto del hogar constituyen discusiones rutinarias y sin importancia entre un hombre y una mujer, que no pueden producir la muerte de uno de éstos. Hoy en día, resulta incuestionable el hecho de que existe un gran número de casos de violencia doméstica que ameritan la aplicación de la legítima defensa y del síndrome de la mujer maltratada como complemento de ésta.

No podemos ignorar el incremento sustancial de muertes ocurridas en casos de violencia doméstica durante los últimos años. Según las estadísticas más recientes de la Policía de Puerto Rico, el número de mujeres que han muerto durante un conflicto doméstico ha aumentado desde el año pasado, y las estadísticas sobre casos

casos, el testimonio resulta útil para explicar por qué la mujer creyó necesario ultimar a su agresor en reacción a un ataque que aparentemente no era mortal. *Developments in the Law: Legal Responses to Domestic Violence,* supra, pág. 1581.

En ambos casos, el testimonio pericial sobre el síndrome de la mujer maltratada se debe presentar en conjunto con la prueba sobre los actos previos específicos de la víctima, al amparo de *Pueblo v. Martínez Solís*, supra. Así, luego de escuchar el testimonio pericial sobre el síndrome de la mujer maltratada, el juzgador de hechos se encontrará en una mejor posición para evaluar si, ante un patrón de violencia doméstica como el reseñado, una persona prudente y razonable, en la posición de ésta, sabiendo lo que sabía y viendo lo que vio, hubiera creído necesario ultimar a su compañero-agresor en defensa propia. *Pueblo v. González Román,* supra.

Examinada la teoría de defensa propia y los casos, en los cuales es necesario traer el síndrome de mujer maltratada como complemento, procede evaluar la apelación ante nos para determinar si estamos ante un caso en que se justifique invocar la legítima defensa.

## III

En el caso de autos, la señora González Román señala que el Jurado erró al rendir un veredicto de culpabilidad cuando la prueba del Ministerio Público estableció todos los requisitos de legítima defensa y un caso prima facie de mujer maltratada. En su alegato, sostiene que ella dio muerte a su esposo en legítima defensa cuando repelió un ataque armado perpetrado por él en estado de embriaguez.

De la exposición narrativa de la prueba se desprende que el agente Diego Figueroa, testigo de cargo, declaró que

---

de violencia doméstica son cada día más alarmantes.

la señora González Román le informó que el 10 de diciembre de 1990 su esposo Jorge René Rivera había llegado borracho de madrugada y comenzó a golpear con un martillo la puerta del cuarto matrimonial, donde ella se encontraba, para que le abriera. Cuando ella le abrió la puerta, éste tiró el martillo al piso y la cogió por el cuello amenazándola con un cuchillo que tenía en la mano. Se formó un forcejeo entre ellos y él resultó herido con el cuchillo. El agente testificó que la puerta tenía una hendidura en la parte central superior.

El testimonio incontrovertible del patólogo forense, que testificó como parte de la prueba de cargo, estableció que de acuerdo con la forma elíptica de la herida del occiso era posible que ésta se hubiese producido como resultado de un forcejeo entre la señora González Román y su esposo. Éste declaró que el occiso sólo tenía una herida en el lado izquierdo del ombligo y que dicha herida coincidía con el cuchillo de cocina que le entregó la apelante a la Policía. Señaló además que, por su forma y apariencia, la herida era compatible con un forcejeo. El patólogo también describió que ésta era compatible con una herida producida por una persona que hubiese estado de frente a él y que fuese cuatro (4) o cinco (5) pulgadas más pequeña que éste, como es el caso de la señora González Román. Por último, el patólogo confirmó que el occiso estaba en estado avanzado de embriaguez, pues tenía un contenido de .31 de alcohol en la sangre.

Por su parte, la defensa trajo prueba sobre los actos previos del occiso que establecía que éste era un hombre violento y que, cuando bebía, agredía fuertemente a su esposa, para explicar la razonabilidad del miedo que sintió ésta ante el ataque. Además, presentó prueba pericial que acertó la existencia de un cuadro de una mujer maltratada.

En fin, tanto la prueba presentada por el Ministerio Público como la presentada por la señora González Román, demostraron todos los requisitos que se exigen para invo-

car la legítima defensa. Quedó probado que hubo un forcejeo entre la señora González Román y su esposo, en el cual ésta fue amenazada con un arma mortal. Ella tenía motivos fundados para creer que estaba en inminente peligro de muerte o de grave daño corporal; además, tuvo la necesidad racional del medio utilizado para impedir o repeler el daño, pues su vida peligraba a manos de un hombre armado que estaba ebrio y quien ella sabía que era muy violento.

La prueba sobre los actos previos específicos del occiso demostró claramente que él agredía a la señora González Román con frecuencia y que acostumbraba a amenazarla con quitarle la vida. Dicha prueba reflejó un patrón de conducta agresiva por parte de éste, en particular cuando ingería bebidas alcohólicas, que a todas luces indicó que no hubo provocación por parte de la señora González Román. Por último, el informe del patólogo revela que ella no infligió más daño que el necesario para repeler o evitar la agresión, pues el occiso sólo tenía *una* (1) herida en el lado izquierdo del ombligo. Además, la vida de la señora González Román estaba en grave peligro de muerte.

Por su parte, el Procurador General reconoce en su informe ante nos que "la *única* controversia que surge de la evidencia presentada ante el jurado trata de las *circunstancias* en que ocurrió la muerte de la víctima". (Énfasis suplido.) Informe del Procurador General, pág. 17.

El Procurador expone que, "contrario a lo relatado por la apelante, no fue el occiso el que llegó a las 4:30 de la mañana sino ésta". Añade que de los hechos se podía inferir que era el occiso "el que dormía cuando llegó la apelante". Informe del Procurador General, pág. 17. No obstante ello, la propia prueba del Ministerio Público estableció que no había sangre en el cuarto matrimonial ni en la cama, como hubiese ocurrido si la señora González Román hubiese matado al occiso mientras éste dormía, como sostiene el Procurador General. Incluso, la prueba de cargo estableció que

su muerte ocurrió como resultado de un forcejeo en el cual tanto la señora González Román como el occiso estaban de pie uno frente al otro. Estableció, además, que había sangre frente a la puerta del cuarto matrimonial, lo cual es compatible con la versión de los hechos que dio la señora González Román de que fue precisamente frente a la puerta de dicho cuarto donde ocurrió el forcejeo.

Aunque en el caso de autos existen versiones conflictivas sobre quién llegó primero a la casa la madrugada cuando ocurrieron los hechos, esta información no es determinante en el análisis de la controversia medular en la apelación ante nos. De hecho, independientemente de quién llego primero a la casa, lo que sí resulta de vital importancia para efectos del resultado al que llegamos hoy es que quedó probado por la prueba presentada que hubo un forcejeo entre la señora González Román y su esposo, y que ella se vio en la necesidad de defender su vida de una agresión armada que no provocó.

El énfasis, que tanto el Ministerio Fiscal como el Procurador General le brindaron al hecho de quién llegó primero al lugar de los hechos en la madrugada, tuvo el propósito de desenfocar la atención del Jurado del asunto de la legítima defensa, que es la controversia medular de este caso. Además, la teoría del Ministerio Público y del Procurador General tiene el propósito y el efecto de poner en entredicho la conducta y el carácter de la señora González Román esa noche, a base de una visión estereotipada sobre el rol de la mujer en el hogar.

El hecho de que hubo un forcejeo entre el occiso y la señora González Román, unido a la evidencia no controvertida presentada por la defensa sobre los actos específicos previos del occiso que demuestran que éste era violento, que bebía, que agredía frecuentemente a su esposa y que la amenazaba regularmente —por medio de machetes, cuchillos y palos— con quitarle la vida, es suficiente para crear duda razonable en el ánimo del juzgador de los hechos so-

bre si la acción de la señora González Román —de dar muerte a su esposo— fue o no en defensa propia como ella alegó. Si, además, tomamos en consideración el ciclo de violencia al cual estaba sometida la señora González Román y el temor legítimo que le infundía su esposo cuando la agredía en estado de embriaguez, procede reconocer que existen dudas razonables sobre si esa noche ella actuó en defensa propia para repeler su ataque armado.

## IV

Nuestra decisión parte de la premisa de que en nuestro ordenamiento constitucional se presume inocente a todo acusado de delito mientras no se pruebe su culpabilidad más allá de toda duda razonable. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Le corresponde al Ministerio Público probar la culpabilidad del acusado mediante evidencia que establezca todos los elementos del delito más allá de duda razonable. *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992).

Es un principio establecido de derecho que:

"... El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea 'suficiente', esto es, que 'verse' sobre todos los elementos del delito imputado; se le requiere que la misma sea 'suficiente en derecho'. Ello significa que la evidencia presentada, 'además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación' o en un ánimo no prevenido. ... Esa 'insatisfacción' con la prueba es lo que se conoce como 'duda razonable y fundada'." (Énfasis suprimido.) *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454, 472 (1988). Véanse: *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 652 (1986); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974); *Pueblo v. Toro Rosas*, 89 D.P.R. 169 (1963); *Pueblo v. Ortiz Morales*, 86 D.P.R. 456 (1962).

De existir duda razonable acerca de la culpabilidad del acusado, le compete al juzgador de los hechos absolverlo. Const. E.L.A., *supra*.

■ Ante la duda razonable que provoca la prueba en el caso de autos, sobre si la acción de la señora González Román fue o no en legítima defensa, el Jurado erró al emitir un veredicto de culpabilidad y procede que lo revoquemos. "[L]a determinación que ha hecho el juzgador de los hechos a nivel de instancia a los efectos de que la culpabilidad del imputado de delito ha quedado establecida más allá de duda razonable es una que es revisable en apelación como 'cuestión de derecho'." *Pueblo v. Cabán Torres*, supra, pág. 653. Así lo reconocimos en *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552, en el cual señalamos:

> "No cumpliríamos con nuestro deber si estando plenamente convencidos de que la prueba en determinado caso no establece la culpabilidad más allá de duda razonable, permitiéramos que prevaleciera una sentencia condenatoria. Cuando ello ocurre no se trata de una intervención con la función del juez o del jurado en la apreciación de la prueba, sino de un error de derecho." Citando a *Pueblo v. Serrano Nieves*, 93 D.P.R. 56, 60 (1966).

■ Aunque en repetidas ocasiones hemos dicho que los juzgadores de hechos nos merecen respeto y confiabilidad en la apreciación imparcial de la prueba y que, de ordinario, no intervendremos con el fallo inculpatorio, esto no significa que las determinaciones de los juzgadores de hechos sean infalibles:

> De ahí en que en muchos casos no hemos vacilado en dejar sin efecto un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado. ...
> Hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila. *Pueblo v. Carrasquillo Carrasquillo*, supra, págs. 551–552. Véanse, además: *Pueblo v. Somarriba García*, 131 D.P.R. 462 (1992); *Pueblo v. Rivero, Lugo y Almodóvar*, supra, pág. 473; *Pueblo v. Cabán Torres*, supra, pág. 655.

Es preciso que enfaticemos que no se trata de que la señora González Román pruebe su inocencia más allá de toda duda razonable, como pretende la teoría del Procurador General presentada ante nos, sino que le correspondía al Ministerio Público probar su culpabilidad más allá de duda razonable. Concluimos que, en el caso en cuestión, la prueba presentada por el Ministerio Público no logró su propósito. Ante la insatisfacción que sentimos con la prueba desfilada sobre la culpabilidad de la señora González Román, nuestro deber es revocar el dictamen del Jurado en el caso de autos.

## V

A modo de resumen y conclusión, reiteramos que la prueba del Ministerio Público demostró que hubo un forcejeo entre la señora González Román y su esposo no provocado por la primera, y que ésta, al ver amenazada su vida con armas mortales —un cuchillo y un martillo— tuvo que defenderse. La actuación de la señora González Román cae dentro del esquema tradicional de la legítima defensa, ya que cumple con los requisitos del Art. 22 de nuestro Código Penal, *supra*. En estas circunstancias, no es necesario considerar la aplicabilidad al caso de autos del síndrome de la mujer maltratada como complemento de la legítima defensa.[9]

Por los fundamentos que anteceden, *revocamos la sentencia apelada y absolvemos a la señora González Román.*

*Se dictará la sentencia correspondiente.*

Los Jueces Asociados Señor Negrón García y Señor Fuster Berlingeri emitieron sendas opiniones disidentes. El

---

[9] Debido a que en el caso anterior *Pueblo v. González Román*, supra, admitimos un testimonio pericial sobre el síndrome de la mujer maltratada como complemento de la legítima defensa, de este Tribunal haber concluido que no hubo un forcejeo y que la señora González Román no fue amenazada con un arma mortal por su esposo, hubiese sido necesario discutir la aplicabiliad o no del síndrome de la mujer maltratada como complemento de legítima defensa al caso de autos.

Juez Asociado Señor Rebollo López disintió sin opinión escrita.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

La opinión mayoritaria se apuntala en una configuración fáctica *no* avalada por la prueba creída por el Jurado. Nos explicamos.

## I

Se llegó a la conclusión de "que hubo prueba *contundente* de que hubo un forcejeo" —(énfasis suplido) opinión mayoritaria, pág. 695 esc. 2— entre la acusada Marina González Román y la víctima Jorge René Rivera, y ello activa la legítima defensa como eximente de responsabilidad penal. En virtud de esa tesis, nos dicen que el Jurado debió absolverla, pues ella solamente defendió su vida ante un peligro inminente de muerte.

También afirman que el testimonio incontrovertible del patólogo forense, quien testificó como parte de la prueba de cargo, tendió a establecer que la forma de la herida reflejaba la existencia de un forcejeo entre la señora González Román y su esposo. Opinión mayoritaria, pág. 70. *No es así*; esa apreciación es totalmente especulativa.

En su testimonio, el patólogo Francisco Cortés Rodríguez describió como *elíptica* la herida que presentaba el cadáver de la víctima. Cuando la defensa le preguntó en específico si dicha herida reflejaba con claridad que se había infligido durante un forcejeo, se desarrolló el siguiente diálogo, que por su importancia, transcribimos *in extenso*.

P.  Yo le pregunto, entonces, si ese tipo de herida es compatible con heridas donde se produce un forcejeo.
R.  No, no entiendo lo que... la pregunta en sí. ¿Si es compatible con una herida donde se produce un forcejeo?

P.  Sí. O sea, la pregunta que yo le estoy haciendo es ...

R.  Anjá.

P.  ... hay dos personas luchando, dos personas luchando: una de ellas trae un cuchillo y en un forcejeo ese cuchillo se vira y se puede producir esa herida, esa herida de forma elíptica que usted ha definido.

R.  No tiene que haber, necesariamente, ese cambio de configuración, si eso es lo que usted quiere decir. Lo que puede cambiar en sí es si se introduce un arma blanca, como un cuchillo, y si se gira, se gira, o sea, se vira la mano y al salir puede causar una herida bien irregular. Podrían aparecer como ... entonces, sería una cruz con la otra ... o podría alargar una herida en forma de "V". *En este caso, pues, no hubo eso, pero no sería exclusivo de forcejeo eso. O sea, el forcejeo no, necesariamente, tiene que producir ese tipo de cambio en la herida.*

P.  Sí, pero puede haber una herida elíptica que sea también producto por un forcejeo.

R.  Es, básicamente, elíptica la herida que se produce cuando hay ese tipo de cambio en la, en la trayectoria.

P.  En un forcejeo.

R.  Sí, por supuesto.

P.  Por supuesto.

Yo no tengo más preguntas. Muchas gracias, doctor. (Énfasis suplido.) T.E., págs. 242–243.

Este intercambio reveló únicamente que, si bien era posible que se produjera una herida elíptica como resultado de un forcejeo, no siempre era así.

Acto seguido, el Fiscal interrogó:

P.  Mire a ver si esa herida ... si la persona ... si don Jorge René hubiera tenido ese cuchillo y le hubiera tenido para agredir a una persona y con el arma, don Jorge René, él mismo da la vuelta, hay un forcejeo y se entierra el cuchillo, ¿cómo sería la herida en ese caso?

R.  ¿La trayectoria? ¿Cómo ....

P.  Si don Jorge René, el occiso ....

R.  Sí.

P.  ... fuera la persona que tuviera el cuchillo. Jorge René, asumiendo que esto sea el cuchillo, tiene un cuchillo, está forcejeando con una persona y la trayectoria... en el mismo forcejeo él mismo se entierra el arma, ¿cómo sería la trayectoria de esa herida?

R.  *¡Ah, la trayectoria de esa herida! A nivel de, de esto no sería de abajo hacia arriba.*

P. ¿Cómo sería?

R. *Sería de adelante hacia atrás o directo o de arriba hacia abajo.*

P. *¿Y en este caso es?*

R. *De abajo hacia arriba.*

P. *¿Y no hay ningún otro signo de violencia en todo el cuerpo de este señor?*

R. *Ninguno que se pudo visualizar.*

No tengo más ninguna pregunta.

LCDO. BERMÚDEZ MELÉNDEZ:

Juez, sí, una pregunta.

P. Mire, esa, esa opinión que le pide el compañero fiscal cambiaría, dependiendo de la mano en que el occiso tuviera el cuchillo?

R. *No, la clave aquí, ¿me permite ponerme de pie para ilustrar?*

P. Sí.

R. Ok. La clave aquí es la localización de la herida que está al lado del ombligo. Si se hubiera girado la, la mano y le hubiera, se hubiera producido la herida en la parte superior del abdomen, eso sí podía producir una trayectoria de abajo hacia arriba. Si se doblara la mano, se hiciera algún tipo de presión, no importa, o sea, si se hace mucha presión, pues, caería porque la presión que se hace a nivel de la muñeca, pues, sería suficiente para soltar el arma blanca, pero si se empuja con el puño o con el antebrazo, si es de esta forma, la trayectoria sería o directa, en otras palabras, directa así o de arriba hacia abajo. Porque si se va a virar para empujar hacia arriba, pues, la presión sería mucha en la muñeca.

P. Bien. Eso es asumiendo, usted le está dando el ejemplo a las Damas y Caballeros del Jurado con la mano derecha.

R. Correcto.

P. Ahora, con la mano izquierda, le pregunto....

R. Anjá.

P. *Ahora, con la mano izquierda y una persona más bajita que el occiso, hay un forcejeo y en ese forcejeo se logra virar el cuchillo, ¿me sigue?, y en ese forcejeo se logra virar el cuchillo, ¿pudiera haber esa trayectoria también de abajo, de abajo hacia arriba y de adelante hacia atrás?*

R. *O sea, sería de abajo hacia arriba si fuera superior, pero estamos justamente, o sea, a nivel del ombligo, esto aquí es ya el centro de gravedad de la persona. Al introducirse la herida aquí, ¿se da cuenta? uno, ésta es la parte que apenas se mueve. Esta parte se mueve mucho más, por eso uno tendería a coger el cuchillo hacia arriba, pero aquí, aquí no, éste es el punto fijo,*

*digo, éste es el pivote, el pivote, ¿ok? y por eso es que la herida no, no mostraría un desvío de abajo hacia arriba. Sí, si fuera acá arriba, pero a nivel del ombligo ya, o sea, del centro de gravedad, del centro del cuerpo ya esto es ... se mantendría.*

P.   Se manten... usted hace un movimiento hacia....

R.   Se mantendría, o sea, el movimiento ... porque cuando ocurre la, la, la ... cuando hay un, un ataque con un arma blanca la, la tendencia del cuerpo es de protegerse, uno tiende a inhalar, ¿ok? y levanta el abdomen, la parte superior del abdomen se levanta, inhala, se agranda el pecho tratando de huir, de protegerse y eso es involuntario. O sea, eso ocurre reflexivamente.

P.   ¿Aunque sea la persona que va a atacar el que tenga el cuchillo y tenga 31 por ciento de alcohol?

R.   Es que si se, se va a notar eso, ¿entiende? Es una cosa que uno controla. Es un reflejo. A este nivel, a este nivel ya ésta es la parte que no se va a afectar tanto. O sea, el movimiento es éste y esto lo que va a ir es más directo. Arriba no. Si fuera arriba no habría ningún problema porque esto se ... ¿entiende? Al inclinarse el cuerpo ya el cuchillo va a su ... la trayectoria intracorporal va a ser de abajo hacia arriba. ...

.     .     .     .     .     .     .     .

R.   Bueno, la configuración de la herida, lo que le quiero decir con que es posible un forcejeo es que el forcejeo no, necesariamente, va a cambiar la configuración de la herida, no va a cambiar la apariencia de la herida. La herida se cambia la apariencia por dos cosas: una es por la piel, porque la piel no es la misma, tiene diferentes patrones, de los cuales se aprovechan los cirujanos para cuando van a coser la herida que salga una cicatriz finita. La otra cosa es que se va a cambiar la configuración si hay una especie de, de cambio, de giro en trayectoria una vez que la hoja de la arma blanca está dentro del cuerpo. Si cambia su dirección, cuando sale, pues, entonces, va a causar otra herida casi, casi sobre impuesta que puede ser o una cruz o una 'T', pero va a ser, básicamente una herida elíptica, pero serían dos heridas en, prácticamente, que coinciden en un orificio. Pero que cambian la configuración, este... como sobre impuesto como una cruz o como una "V". (Énfasis suplido.) T.E., págs. 243–246 y 247–248.

Es evidente que, no empece los esfuerzos de la defensa por lograr que el patólogo afirmara sobre la existencia de un forcejeo, éste no pudo arribar a esa conclusión. Es forzada, pues, la conclusión mayoritaria.

## II

No cuestionamos que la víctima ingiriera bebidas alcohólicas y agrediera a su esposa González Román. No obstante, asimismo es de rigor consignar que ella también lo agredía, *llegando al punto de correrlo con cuchillos "por borrachón"*, cortándolo en la mejilla en una ocasión e, incluso, lo había amenazado diciendo que si ella no lo mataba, ordenaría a otra persona que lo hiciera.

Aparte de que el Jurado creyó la teoría del Ministerio Fiscal, hubo prueba de dos (2) versiones distintas sobre la manera como murió Rivera. La *primera*, por voz de su suegro, a los efectos de que le había informado mediante gritos que le habían matado su marido. La *segunda*, brindada al agente investigador, la cual consistía en que la víctima, portando un martillo, pretendió entrar a la fuerza al cuarto donde se encontraba y, luego, lo tiró para cogerla por el cuello, produciéndose un forcejeo que tuvo como resultado que la víctima se "hiriera" con el cuchillo que tenía en sus manos.

La primera versión ni siquiera sugiere —en un momento contemporáneo a los hechos— que el incidente fuera resultado de un maltrato conyugal, elemento que luego fue medular en su defensa. De otra parte, destacamos que la apelante González Román admitió que en efecto había corrido a la víctima con cuchillos y, según hemos visto, precisamente murió apuñalada.

Difícilmente estamos ante un error de derecho. Ante nos tenemos *una particular valoración fáctica y apreciación de la prueba* por el Jurado que dirimió la credibilidad de los testigos. Dichos juzgadores, con sobrada razón, no dieron crédito a la versión de la acusada González Román de que había actuado en legítima defensa, máxime —contrario a lo concluido por la mayoría— de que hubo prueba "contundente" de un forcejeo. Aparte del testimonio pericial en contrario, los hechos demuestran que la ropa del occiso Rivera

estaba enganchada en un clavo y su cadáver estaba vestido sólo con un pantaloncillo blanco, datos cruciales que corroboran objetivamente la teoría del Ministerio Público de que dormía en su casa cuando ella llegó y lo apuñaló en el vientre.

### III

Nuestra sociedad padece del mal endémico y se ve aquejada por graves y dolorosos casos de maltrato conyugal y violencia doméstica. Analizar cada caso con cuidado es tarea principal del Jurado o juez de instancia. Reiteramos que los hechos determinan el derecho; no al revés.

Mientras no se desarrolle otro método más rápido y confiable, la fidelidad al principio de no intervención con la apreciación de la prueba y el dictamen final del juzgador —fallo inculpatorio— ha de guiar inicialmente el estudio apelativo de la prueba presentada en instancia.

Y es que en esta etapa, la culpabilidad, como dictamen, está basada en la premisa de que se probó más allá de duda razonable cada uno de los elementos del delito imputado. Corresponde, pues, al apelante demostrar que la prueba desfilada no satisfizo ese *quantum* requerido. De esta forma, si de la transcripción de evidencia o exposición narrativa surge que hubo alguna prueba conflictiva sobre uno de los elementos del delito, y el apelante no impugna exitosamente la suficiencia de la totalidad de la prueba, en sana lógica decisoria tenemos que presumir que el juzgador de los hechos creyó la versión que no derrotaría su fallo de culpabilidad.

Estos principios de adjudicación apelativa racional nos obligan a esbozar una versión de hechos distinta a la consignada en la opinión mayoritaria: *la verdaderamente creída por el tribunal sentenciador.* (Énfasis en el original.) *Pueblo v. Rosario Igartúa*, 129 D.P.R. 1055, 1082–1083 (1992), opinión disidente.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

Reiteradamente hemos resuelto que es al juzgador de los hechos a quien le corresponde dirimir la cuestión de credibilidad, cuando en algún caso existan versiones conflictivas sobre éstos, y que este Tribunal no intervendrá con la apreciación de la prueba que haya hecho el juzgador en instancia, a menos que exista pasión, prejuicio o error manifiesto. *Pueblo v. Acabá Raíces*, 118 D.P.R. 369 (1987); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo v. Díaz Ríos*, 107 D.P.R. 140 (1978); *Pueblo v. Rosario Cintrón*, 102 D.P.R. 82 (1974); *Pueblo v. Nevárez Virella*, 101 D.P.R. 11 (1973); *Pueblo v. Vázquez López*, 98 D.P.R. 15 (1969); *Pueblo v. Rodríguez Hernández*, 91 D.P.R. 183 (1964); *Pueblo v. Rodríguez Ocaña*, 88 D.P.R. 335 (1963). Como hemos dicho antes, por tratarse de una cuestión de credibilidad, "no estamos justificados en alterar la determinación de los que vieron y oyeron a los testigos". *Pueblo v. Rodríguez González*, 101 D.P.R. 1, 4 (1973). "Lo contrario, esto es, la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia, significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción". *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 648 (1986).

En el caso ante nos, existían versiones claramente conflictivas de los hechos y el Jurado hizo una determinación de culpabilidad que, en conciencia, estimo, debemos respetar. *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974). Como la mayoría opta por seguir otro camino, disiento.

# I

En este caso, la acusada fue encontrada culpable de homicidio e infracción al Art. 4 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 414, y sentenciada a cumplir seis (6) años y seis (6) meses de reclusión por ello. Ambas penas fueron suspendidas.

Durante el juicio, el pueblo presentó ocho (8) testigos de cargo. En esencia, su versión de los hechos fue la siguiente: El occiso y la acusada, marido y mujer, tenían un historial de peleas domésticas, *en las que ambos se agredían*, mientras estaban, con frecuencia, bajo los efectos del alcohol. Antes del día de los hechos, *la acusada había corrido al occiso con cuchillos*. En una ocasión, la acusada incluso había amenazado al occiso diciéndole que *si no era ella quien lo mataba, lo iba mandar a matar. En otra ocasión, la acusada había cortado al occiso en la mejilla.*

El 9 de diciembre de 1990, la acusada llegó a una fiesta de bautismo a las 4:30 P.M. y el occiso llegó a las 7:30. Más tarde, a las 9:30 P.M., una de las asistentes a la fiesta le pidió a la acusada que se fuera del lugar porque estaba sacando hombres a bailar delante de su esposo. La acusada, quien ya se había tomado varias cervezas, salió del lugar, llevó sus hijos a casa de sus abuelos, y se fue a un bar con otro hombre, donde permaneció hasta las cuatro y media de la madrugada.

Al día siguiente, a eso de las 4 de la tarde, cuando el padre del occiso llegó a la casa de éste, la acusada le informó que *alguien había matado a su esposo*. La apelante también le dijo al primer policía que llegó al lugar a investigar, *que había encontrado a su esposo muerto un par de horas antes y que no sabía lo que había pasado.*

Luego llegó otro agente de la Policía, a cargo de la investigación, quien entrevistó a la acusada y le hizo las advertencias de rigor. La acusada entonces cambió su versión inicial de los hechos. Le alegó al agente que, a eso de las

4:30 A.M., su esposo había llegado hasta el cuarto donde ella dormía, que empezó a dar martillazos en la puerta y que, cuando ella la abrió, el occiso la cogió por el cuello, forcejaron y, con un cuchillo que éste tenía, resultó herido. *No pudo explicarle al agente de dónde sacó el cuchillo el occiso, cuando, al soltar el martillo, lo que hizo fue cogerla a ella por el cuello.*

El agente a cargo de la investigación no encontró señales de violencia en la residencia del occiso y la acusada. La ropa del occiso estaba en un cuarto enganchada de un clavo. Su cadáver se encontraba vestido sólo con un pantaloncillo blanco y aparentaba llevar varias horas de muerto.

Conforme a la teoría de El Pueblo, el occiso dormía en su casa cuando la acusada llegó a la residencia. Luego ésta le dio muerte, al asestarle una puñalada en el vientre.

Frente a esta versión de los hechos, la acusada alegó defensa propia. Avaló dicha defensa esencialmente con un testimonio pericial. Éste opinó que la acusada presentaba las características del síndrome de mujer maltratada. La opinión de la perito se basó *exclusivamente en entrevistas con la acusada, con los abogados y un hermano de ésta, y en algunas declaraciones juradas sobre los hechos.*

Como puede observarse, el Jurado evidentemente entendió que la opinión de la perito de defensa estaba apoyada en fundamentos débiles. No aceptó las inferencias y conclusiones de ésta y, ciertamente, no estaba obligado a hacerlo. *Pueblo v. Montes Vega*, 118 D.P.R. 164 (1986). Por otro lado, la prueba presentada por el Ministerio Público, evidentemente creída por el Jurado, era suficiente para encontrar culpable a la acusada.

## II

Es menester resaltar que la prueba habida en este caso no es exactamente como la relata la mayoría en su opinión. Lo que aparece en dicha opinión es sólo un recuento *selec-*

*tivo* y no refleja fielmente toda la prueba presentada, sobre todo la prueba de cargo, que fue la que creyó el Jurado.

Así, pues, la mayoría en su opinión no alude de modo alguno a *las dos versiones distintas* que dio la acusada sobre los hechos, primero que no sabía cómo había muerto su esposo y, luego, que ella lo hirió en defensa propia. Tampoco la mayoría alude a la prueba de cargo en el sentido de que la acusada también había agredido al occiso antes; que lo había corrido con cuchillos; que lo había amenazado de muerte; que también bebía, y que había ingerido alcohol la noche de los hechos.

Por otro lado, la mayoría afirma que hubo "prueba contundente"[1] de que había ocurrido un forcejeo entre el occiso y la acusada, que resultó en la muerte del primero. ¿Cuál fue esa supuesta "prueba contundente"? Sólo consta en autos un testimonio directo sobre el particular. Éste consiste de la *segunda explicación de lo sucedido*, que la acusada le dio al policía a cargo de la investigación, en la cual no pudo explicar cómo ni de dónde salió el cuchillo con el cual ella mató al occiso. Se trata, pues, de evidencia de cuestionable valor probatorio, por ser un testimonio interesado, contradictorio e incompleto. También debe tomarse en cuenta que la Policía examinó el lugar de los hechos y no encontró señales de violencia allí. La mayoría también descansa en el testimonio del patólogo forense para concluir que quedó probado que hubo un forcejeo entre la acusada y el occiso. Pero todo lo que el patólogo opinó, como perito, fue que la herida del occiso era *compatible* con la alegación de un forcejeo. De dicho testimonio pericial sólo surge una *posibilidad* de forcejeo, por inferencia. El perito no podía establecer que en efecto hubo forcejeo, puesto que este perito no presenció los hechos. No hay, pues, la "prueba contundente" que la mayoría dice que hubo sobre el forcejeo; mucho menos la hay, sobre la muerte del occiso, como resultado de éste.

---

[1] Véase esc. 2 de la opinión mayoritaria.

Más aún, la mayoría sorprendentemente apoya su particular apreciación de los hechos en lo declarado por la *perito* de la defensa. Según la mayoría, la perito "declaró que [la acusada] era agredida con frecuencia por su esposo"; la perito "estableció que el occiso tenía problemas de bebida y que su su nivel de violencia aumentaba en la medida que bebía"; la perito "estableció ... el ciclo de violencia al cual estaba sometida la apelante"; la perito testificó "que esa madrugada el occiso llegó borracho y violento ... y la trató de agredir con un cuchillo". En otras palabras, la mayoría acepta como *prueba* —de los hechos particulares en controversia— la declaración de una *perito* sobre *eventos concretos que no le constaban personalmente.* La perito de la defensa —a quien la mayoría erróneamente llama "perito-testigo", sin que fuera testigo con conocimiento propio de los acontecimientos— tenía una versión de los hechos, pero estaba basada esencialmente en lo que le había contado la propia acusada, sus abogados y un hermano de ésta. Tal versión, claramente parcializada, no era *prueba* de los hechos concretos del caso. Es realmente inconcebible que la mayoría la acepte como tal, en contravención de los más elementales principios del derecho de prueba. Lo que la mayoría hace repetidamente en este caso rebasa por mucho lo que, con gran liberalidad, hemos resuelto sobre el uso del testimonio pericial. Conforme con lo dispuesto en la Regla 56 de Evidencia de Puerto Rico, 32 L.P.R.A. Ap. IV, hemos reconocido que un perito puede fundar su testimonio como tal, incluso sobre bases que serían inadmisibles en evidencia, *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988); pero su testimonio sigue siendo, y siempre es, un testimonio de *opinión.* No es prueba directa de los hechos. Tampoco le corresponde al perito determinar quién dice la verdad sobre los hechos ni adjudicarle credibilidad a la versión de éstos que, convenientemente, tenga el acusado.

## III

En resumen, pues, este caso sólo presenta un problema común de apreciación de la prueba. Objetivamente examinado, no hay nada en éste que justifique una intervención nuestra, de carácter excepcional, para revocar la determinación del Jurado. Lo único algo fuera de lo ordinario que presenta este caso es el planteamiento —por la acusada— del síndrome de mujer maltratada, el cual no convenció al Jurado. La mayoría admite que tal planteamiento no es una defensa absoluta, que con sólo alegarla proceda que se absuelva a la acusada; más aún, la mayoría resuelve expresamente que "no es necesario considerar la aplicabilidad al caso de autos del síndrome de la mujer maltratada como complemento de la legítima defensa". Sin embargo, la inusitada decisión de la mayoría de sustituir su selectiva apreciación de los hechos por la del Jurado parece responder al peso que *de hecho* le ha dado a dicho planteamiento. La mayoría no sólo dedica varias páginas de su opinión a discutir el asunto del síndrome de la mujer maltratada, sino que, para revocar la apreciación del Jurado, descansa, en gran medida, en el testimonio pericial que la defensa presentó en instancia. Éste giró precisamente sobre dicho síndrome y sobre su efecto en la conducta de la acusada. Diga lo que diga la mayoría en su opinión sobre el particular, de entrelíneas surge transluciente la consideración real que se le ha dado a la alegación de la acusada de ser una mujer maltratada, aunque el Jurado no lo creyera o no lo considerara suficiente para justificar que le diera muerte al occiso.

No cabe duda de que nuestro país sufre un gravísimo problema de maltrato contra la mujer en casos de violencia doméstica. El Estado evidentemente no ha hecho lo suficiente para tratar de erradicar de raíz este infame mal social y para ajusticiar a quienes abusan de sus esposas. Sin embargo, nada de ello justifica dislocar uno de los prin-

cipios fundamentales de nuestro ordenamiento jurídico, como lo hace la mayoría en este caso, cuando interviene con una adjudicación del Jurado en una situación en la cual, innegablemente, existían versiones conflictivas de los hechos y no quedó demostrado que dicho Jurado actuó con pasión, prejuicio o de modo patentemente erróneo. Por ello, disiento.