TEXTO COMPLETO DE LA SENTENCIA
I
Por hechos ocurridos en Juana Díaz el 27 de enero de 2003, el apelante Jacinto García Rodríguez fue acusado ante el Tribunal de Primera Instancia, Sala Superior de Ponce, por los delitos de tentativa de violación, actos lascivos o impúdicos y restricción de libertad agravada, 33 L.P.R.A. sees. 4061, 4067 y 4172, y por infracción a la Ley Contra el Acecho en Puerto Rico, Ley Núm. 284 de 21 de agosto de 1999, 33 L.P.R.A. see. 4013 y ss.
Al apelante se le imputó que el día de los hechos cometió actos lascivos o impúdicos contra la perjudicada Glori Mari Feliciano Feliciano, quien tenía menos de 14 años de edad, y que restringió la libertad de la menor.
*1149 Luego de varios trámites procesales, el Tribunal celebró el juicio contra el apelante, por tribunal de derecho. A base de la prueba desfilada, el Tribunal determinó que el apelante había incurrido en los delitos de actos lascivos y restricción de libertad agravada.
El 27 de octubre de 2005, mediante las sentencias apeladas, el Tribunal de Primera Instancia condenó al apelante a cumplir penas concurrentes de 6 años .de reclusión por el delito de actos lascivos y 2 años por el delito de restricción de libertad agravada, así como el pago de la penalidad especial dispuesta por Ley, 33 L.P.R.A. see. 3214.
Confirmamos.
II
La prueba de cargo presentada por el Ministerio Público consistió en los testimonios de la menor perjudicada, Glori Mari Feliciano Feliciano; del tío abuelo de la menor, Ángel L. Pabón González; de la abuela y madre de la menor, Gloria M. Pabón González; de la maestra de la menor, Rose García Nazario; de la trabajadora social de la escuela de la menor, Tania Martínez Forestier; y de la agente de la Policía que intervino en el caso, Annette Silva.
La menor Glori Mari Feliciano Feliciano declaró que el 27 de enero de 2003, alrededor de las 9:00 a.m., fue a la residencia del apelante, quien era su vecino, para llenar las gomas de su bicicleta. Cuando llegó allí, su tío Ángel Luis Pabón se encontraba hablando con el apelante en el balcón. Su tío se marchó cuando ella llegó.
Según la menor, una vez pasó a la parte trasera de la casa del apelante para llenar las gomas, el apelante la subió al interior de la casa y la llevó a un cuarto. La tiró y la empujó para la cama, le levantó la blusa, el brassier y la mordió en el seno. Le dejó los labios morados, como si fuera una mordida.
El apelante le bajó el pantalón y el panty. Le besó las partes, la vagina. Estaba en la cama. Luego de que el apelante la tocó, se bajó el pantalón y el calzoncillo. Le metió el pene en su vagina. El apelante movía su pene y lo tenía largo y redondo.
El apelante no la quería soltar. Sus padres la estaban llamando para irse a comer. Ella le decía al apelante que la soltara y él no la quería soltar. Luego, se fue para su casa.
Se sintió sucia y asquerosa. El apelante le dijo que si ella les decía algo a sus padres iba a sufrir y la amenazó con un cuchillo filoso y largo. Ella vio el cuchillo. El apelante no lo tenía. Lo vio en la gaveta de la cocina.
Antes de abandonar la casa del apelante, éste le ofreció chocolates.
Le dijo al apelante que no lo hiciera más porque le dolía. Su seno estaba marcado de negro. Por instrucciones de la Fiscal, le enseñó al juez su labio.
A los tres meses de los hechos, les contó a sus padres lo ocurrido. También le contó a la maestra y a la trabajadora social.
No había nadie cuando el apelante la empujó al cuarto. Cuando el apelante le puso el pene en su vagina, estaba como parado, tirado sobre ella. La testigo declaró que ahí fue que el apelante “me la chupó”.
Se sintió con miedo y no hizo nada.
La tarde del 16 de octubre de 2003, mientras se encontraba en el Tribunal de Juana Díaz buscando una orden de acecho, oyó al apelante decirle a Juan Oscar que iba a tomar agua. Ella estaba en el “water cooler” y el *1150 apelante le dijo que le iba a hacer lo mismo. Se sintió nerviosa. Se lo dijo a su papá y a su mamá.
Durante el contrainterrogatorio, declaró que tiene dificultad en leer y escribir. Había ido a casa del apelante a llenar las gomas 3 veces, sola. La casa era bien pequeña. Tenía uno o dos cuartos, un baño y una sala que se ve desde su casa.
El día de los hechos, se fue de la casa del apelante cuando la llamaron sus padres, que fue a como a las 9:00 a.m. Les contó a ambos padres lo ocurrido, porque ellos le preguntaron. Ellos la vieron cuando se fue a bañar. Después de lo ocurrido, ella fue al Hospital San Lucas. Fue a la escuela a las 8:00.
No leyó la declaración jurada que prestó antes de firmarla. Le relató lo sucedido a sus padres, a la agente Silva y a la trabajadora social. Le tenía más confianza a la maestra, pero no confiaba en la gente.
Cuando sus padres la llamaron se fue tarde porque estaba asustada. El apelante no la tenía aguantada. No recuerda si el apelante la tenía agarrada cuando la llevó al cuarto y cuando estaba en la cama.
No botó sangre por sus partes. La examinó un doctor muchos días después.
Respecto al incidente en el Tribunal de Juana Díaz sobre la violación de la orden de acecho, la menor declaró que sus padres se quedaron en sala y no hicieron nada. Aun viviendo cerca del apelante, nunca había pasado nada. La razón para solicitar la orden de acecho fue que vio al apelante pasar por la calle en una guagua.
El próximo testigo en declarar fue Ángel Luis Pabón González, tío abuelo de la menor.
Declaró que conocía al apelante desde hacía más de 10 ó 15 años. El 27 de enero de 2003, después de las 2:00 p.m., se encontraba en el balcón de la residencia del apelante, hablando sobre un automóvil. Vio que su sobrina llegó para llenar unas gomas. En ese momento se marchó, dejando a la menor frente a la residencia.
Cuando su sobrina llegó, estaba solo con el apelante.
No se enteró de los hechos hasta un tiempo después, que su hermana habló con él. Se sorprendió y habló con el apelante. El apelante le dijo que había surgido un problema, pero el testigo no le informó nada de lo dicho por su hermana.
No existía ningún tipo de asperezas entre su hermana y el esposo de ésta y el apelante.
Sus conversaciones con el apelante eran siempre de automóviles y de las citas a Veteranos. La relación con el apelante era buena. Se mantuvo al margen de la situación por deferencia. Al momento de irse de la casa del apelante no pensó que pudiera pasar nada.
Luego de los hechos, el apelante no se le ha acercado y solamente se han visto y se han saludado. Se vieron una vez que el apelante fue a casa del testigo a llevarle un talonario que el cartero dejó equivocadamente en casa del apelante, pero no dijo nada.
La testigo Gloria María Pabón González declaró que es la abuela de la menor y tiene su custodia desde que ésta tenía 6 meses de nacida. Conoce al apelante hace más de 20 años.
La perjudicada es una niña de educación especial a causa de haber sido paciente de meningitis. El 27 de enero de 2003, al momento de prepararse para salir a una cita, la niña le pidió que le pintara los labios y cuando lo hizo notó algo raro en ella. Aunque ésta le dio varias excusas, entre ellas que había sido con la jaula de los pollitos, *1151 posteriormente le dijo que el apelante la había besado.
La testigo no le prestó mucha importancia debido a la cita que tenía. Al regresar de la cita y comenzar los quehaceres del hogar, la niña se quedó arriba. La testigo se fue para una reunión que tenía en la iglesia. Cuando regresó de la reunión, al momento de darle los medicamentos y la merienda a su nieta y bañarla, pudo ver que ésta mostraba una marca en uno de sus senos. Le preguntó a la niña qué había pasado y ésta le contestó muy nerviosa que el apelante tenía los dientes muy afilados.
Al momento de acostarse, le dijo a la menor que ella no la iba a regañar ni le iba a pegar, pero que le dijera si el apelante le había hecho algo. La niña cogió la mano de la testigo y se la introdujo en la pijama, frotándose su parte íntima. Le dijo ya mami. La testigo no abundó más en el tema y se acostaron a dormir.
Al día siguiente, la testigo le dijo a la menor que hablara con la maestra. La niña se mostró preocupada porque la maestra lo supiera y la botaran de la escuela.
El día de los hechos, 27 de enero, se levantaron como de costumbre. Mientras la testigo se encontraba haciendo un trabajo en el patio durante la mañana, su nieta le dijo que quería correr bicicleta. La niña le pidió a su abuelo que le llenara las gomas de la bicicleta, que estaban vacías. Su abuelo no pudo y a la niña se le permitió ir a casa del apelante, ya que la testigo se percató de que su hermano se encontraba allí.
Oyó cuando su hermano se despidió del apelante. Al ver que transcurrieron entre 5 a 10 minutos le pidió a su esposo que llamara a la niña. La niña llegó, entró la bicicleta, pero no la corrió y entró a la casa a ver televisión.
El 28 de enero, la testigo habló con la maestra y le enseñó los labios que estaban morados en ambos lados. Le solicito a la maestra que le revisara el seno. La maestra le dijo a la testigo que se fuera a su casa, que cualquier cosa la llamaban.
A eso de las 9:00 de la mañana la llamaron. La trabajadora social le requirió que pasara por la escuela porque a la niña le había pasado algo. La testigo se dirigió a la escuela. Allí se reunió con la trabajadora social, la maestra y un representante del Departamento de la Familia.
Luego de haber entrevistado a la niña se dirigieron al Hospital San Lucas II, donde el pediatra que atendió a la menor le informó que ésta tema que ser referida a un ginecólogo. La menor fue atendida por el Dr. Ramírez, ginecólogo.
El apelante vive en su residencia solo.
Describió la vestimenta que llevaba la perjudicada el día de los hechos. La vio llegar con unos chocolates Kisses.
Con anterioridad a los hechos, el comportamiento de la menor era uno normal. Después de los hechos, la menor mostró una conducta nerviosa y de temor. La menor fue evaluada por un psiquiatra, la Sra. Santiago, y por una psicóloga que se llamaba Jennifer.
Con relación al incidente de la Ley de Acecho, la testigo afirmó que lo que promovió esa petición fue que la menor alegaba que el apelante merodeaba por la escuela. Con relación al incidente ocurrido en el Tribunal de Juana Díaz, la testigo declaró que no presenció nada, ya que ella se encontraba en sala y el lugar del incidente en el área de la fuente no estaba visible.
No existía amistad entre ella y el apelante. Su esposo no tuvo que insistir en llamar a la niña porque ella *1152 obedecía. Cuando la niña regresó, su esposo no le notó nada raro. No le comentó nada ese día ni el día siguiente.
No fue hasta las 7:00 de la noche del incidente que su esposo se enteró de lo ocurrido, al ser llamado para que la recogiera en el hospital.
El 27 de enero, los hechos ocurrieron al mediodía. Al momento de la niña regresar, la testigo no vio que ésta tuviera la ropa rasgada, moretones, rasguños o el pelo revuelto.
Respecto a lo ocurrido el 28 de enero, la niña fue entrevistada a solas por el policía, la trabajadora social de Familia y la maestra.
Luego de lo ocurrido, a ella no le consta que el apelante haya tenido cualquier incidente con ella, con su esposo o con la menor.
En cuanto a la orden de acecho, la menor le informó que el acecho consistía en que el apelante pasaba por la escuela a pie. No tenía mucho conocimiento de ese incidente porque su esposo era quien estaba bregando con eso.
Prestó una declaración jurada. No mencionó la amenaza a su nieta con un cuchillo porque no le constaba. Fue su esposo quien tomó control del asunto, referente al caso.
La menor no le decía nada porque había sido amenazada con un cuchillo filoso y grande, y como dijera algo, el apelante le iba a hacer daño a sus papás y ella temía que esto pasara. Eso no lo plasmó en la declaración, aunque la niña se lo había dicho.
Rosa García Nazario testificó que es maestra de educación especial. Para el 27 de enero de 2003, era la maestra de la menor perjudicada. Conocía la relación de Doña Gloria con la menor.
El 28 de enero vio a Doña Gloria y habló con ella cuando ésta llevó a la menor a la escuela. La abuela de la menor le pidió que hablara con ella porque le había pasado algo el día anterior. Doña Gloria le informó sobre la mordedura en el seno, el beso y que la menor fue tocada en su vagina. Doña Gloria interesaba saber si la menor le decía algo más a la testigo, ya que quería saber si la menor había sido violada.
La testigo contactó a la trabajadora social. Una vez llegó la trabajadora social, ella le manifestó lo que le había dicho la abuela de la menor. La menor estaba reacia a hablar con ella.
Luego de que la trabajadora social entrevistó a la menor, la testigo regresó con la niña al salón de clases. A través de la trabajadora social, la testigo advino en conocimiento de que sí había ocurrido algo. La trabajadora social le pidió que retuviera a la menor en lo que ella realizaba varias gestiones, como contactar a la Policía.
Al regresar al salón con la menor, ésta se le acercó a su escritorio, le preguntó si quería ver lo que el apelante le había hecho y se sacó el seno y se lo enseñó. La testigo le dijo inmediatamente que se cubriera porque había otros estudiantes varones. Al preguntarle si había sucedido algo más, la menor se refirió a su parte íntima y se tocó la vagina. La testigo se preocupó más y entonces pidió a otra maestra que se quedara con el grupo y se dirigió a la oficina con la menor.
Al llegar a la oficina, tuvo conocimiento de que ya se había llamado a la mamá de la menor y a otras agencias. En esos momentos, la menor irrumpió en llanto y la directora dialogó con ella. La testigo escuchó que la niña le dijo a la directora que el apelante la había besado, le había bajado los pantalones y que con su pene le frotó la vagina.
*1153 Posteriormente, la testigo se dirigió a casa de la niña con la abuela para buscar la ropa que había utilizado el día anterior, por si acaso servía de algo. Al regresar a la escuela, ya se encontraba la Policía y la trabajadora social del Departamento de la Familia.
Después de ese día, no fue sino hasta el 30 de enero que la testigo tuvo contacto con la menor perjudicada, quien comenzó a mostrar una conducta diferente, a bajar su promedio académico y a tener ciertos incidentes como el de estar llamando a extraños a través de la verja de la escuela y a decir secretos al encargado de alimentos, tratar de tocarles las manos y enviarles cartas de amor a sus amiguitos.
No sabe si un niño de educación especial podría ser manipulado. La menor le aceptó los incidentes con el hombre de la basura, el del comedor y los estudiantes varones.
No recuerda si en la declaración jurada prestada declaró si la niña le había informado que había sido halada por un brazo. No declaró en la declaración jurada que la niña hubiera sido inducida a la fuerza, ni que el apelante la privara de su libertad para hacer lo que había hecho, ni que la perjudicada le dijo que había sido privada de su libertad. La niña no le informó haber sido amenazada con un cuchillo o haber sido violada.
El testimonio de la menor era uno veraz. La menor no le confesó haber sido amenazada, restringida o violada.
Tania Martínez Forestier, trabajadora social en la escuela de la perjudicada, declaró que conocía a la menor. El 28 de enero de 2003, la maestra de la menor se la refirió. Cuando entrevistó a la niña, ésta le dijo que había sido violada.
La menor le dijo que había ido a casa del vecino a llenar la goma de la bicicleta con el permiso del abuelo y que el vecino la cogió por un brazo y la obligó a ir al cuarto. El vecino le bajó el pantalón y se bajo los suyos. La tocó con sus partes. Le subió la blusa y el brassier y le besó los senos y la mordió. Después la llevó al baño y le hizo lo mismo.
Le preguntó a la menor si ella había accedido. La menor le contestó que él la forzó. La menor le dijo que no gritó. Le preguntó que si el apelante le había pasado los genitales o si la había penetrado. La niña afirmó que había sido penetrada.
Le mostró a la menor una ilusión visual de lo que es un roce, una penetración, la vulva y el pene. La menor le dijo que había sido una penetración.
Mientras entrevistaba a la menor, tuvo la oportunidad de observarle en el seno una marca que parecía una mordida. La menor le dijo que la persona era un vecino de ella que le decían Junior, vivía solo y era mayor.
Notó a la menor nerviosa, llorosa. Le preguntó si había sido amenazada por la persona y la menor le dijo que no.
Entrevistó a la abuela e informó al Departamento de la Familia. La técnico Elizabeth Martínez también entrevistó a la menor. Esta fue la persona que acompañó a la menor durante el examen médico que se le realizó en el Hospital San Lucas II.
Este fue el primer caso que la testigo atendió con relación a conducta sexual y el segundo sobre maltrato. La menor fue quien le indicó que había sido violada. Pudo apreciar que la menor conocía el término legal de violación. Durante la entrevista, la menor fue clara e informó que no había hablado con nadie.
La menor nunca le habló de la vagina y siempre se refirió a sus partes privadas. La menor no le describió el *1154 pene, sólo le dijo que estaba duro. El incidente ocurrió tanto en el cuarto como en el baño.
La menor le dijo que había gente en la casa del apelante mientras ocurrió el incidente. En la sala de la casa estaba la vecina de atrás de la mamá y también el hermano de la mamá. Posteriormente le dijo a la testigo que una de las vecinas se llamaba Isabel.
No trajo los informes a la vista porque están en la escuela. En el informe obran los nombres de las personas que la menor alegó se encontraban en la casa del apelante. En la declaración jurada que prestó, no incluyó esa información porque no se lo preguntaron.
La menor no le especificó el tiempo que duraron los hechos, pero por su apreciación, y según lo dicho por la abuela, fue entre 30 a 45 minutos. La menor le dijo que cuando el apelante la sacó del baño frente al tío y a la vecina comenzó a hacerle fresquerías. La vecina no hizo nada. El tío sí se molestó y confrontó al apelante, lo empujó y ahí la menor se marchó corriendo con la bicicleta en mano.
La agente Annette Silva Figueroa declaró que el 29 de enero de 2003 comparecieron a su oficina la perjudicada, su abuela y otros testigos. Al entrevistar a la menor, ésta le dijo que el apelante la había empujado al cuarto, le bajó los pantalones y el panty, se bajó los de él hasta los tobillos, le “empujó el pene en el totin", le “besó el totin”, le mordió un seno y que él terminó y botó un orín amarillo por el pene al piso.
La agente corroboró que la máquina de aire está detrás de la casa. La casa era una de madera y zinc.
En la entrevista, la menor se mostraba nerviosa, llorosa y pausada. Le dijo a la agente que anteriormente el apelante la había besado una vez. La menor le describió el pene del apelante como grande, largo y con una bola.
La niña le dijo que se lo contó al doctor y manifestó varias veces que se quería quitar la vida.
Según se desprende de la investigación, los hechos fueron alrededor de las 9:00. La abuela le informó lo sucedido. Dio seguimiento de lo sucedido a la maestra y a la trabajadora social.
Respecto a la investigación del Hospital San Lucas II, la menor fue atendida por un pediatra quien la refirió al ginecólogo Hermenegildo Ramírez, quien determinó que el himen estaba intacto.
Como parte de la investigación, tuvo conocimiento de la conducta que mostraba la menor donde incluso en una ocasión le puso su número de teléfono al bibliotecario en la mano y lo tocaba mucho. Con relación a una entrevista el 7 de febrero al apelante, éste admitió que la menor estuvo en su casa aproximadamente 2 minutos, pero que una vez ella llenó la goma de la bicicleta, se marchó y no pasó nada.
Entrevistó a todos los que tenían conocimiento de los hechos. El apelante y los familiares de la perjudicada mantenían una relación normal hacía más de 30 años. La abuela le permitía a la menor frecuentar la casa y buscar frutos. Existía una buena relación entre la abuela de la menor y sus tíos.
La menor le dijo que no le iba a decir nada a la maestra por temor a que la botara de la escuela. La agente tomó fotos de las marcas que la menor presentaba en los labios y senos. Se las entregó al Ministerio Público. Siempre acostumbraba a sacar copia de las fotos tomadas por ella antes de entregarlas. En el caso de autos no sacó copia.
La menor no le dijo que el apelante la hubiese amenazado con un cuchillo o que le hubiese dicho que no se lo dijera a nadie y que sus padres sufrirían. La menor le dijo que cuando el apelante la tiró a la cama y le “empujó el pene en el totin” le dolía.
*1155 Por su parte, el apelante presentó el testimonio del agente Carlos Irán García y del tío de la menor, Nicolás Feliciano Morales. Estos testigos fueron anunciados por el Ministerio Público, pero fueron renunciados por esa parte.
El agente García declaró que intervino en una querella presentada por el Sr. Nicolás Feliciano con relación a un incidente entre la nieta de éste y el apelante.
En ese incidente se encontraban en una vista en el Tribunal de Juana Díaz cuando la nieta del querellante le informó al llegar a su residencia que el apelante la había amenazado con que le haría lo mismo afuera en el área de los pasillos. En una cita posterior se le informó al juez y éste instruyó que se tenía que presentar una querella por violación a la Ley de Acecho.
Por su parte, el Sr. Feliciano Morales declaró que él conocía al apelante hacía 20 a 25 años. Ni él, ni su esposa o su nieta frecuentaban la casa del apelante.
El 27 de enero de 2003 se encontraba trabajando en su residencia en un piso de concreto y la menor le pidió que le llenara la goma de la bicicleta con el camión. Como estaba ocupado, le dijo que no podía. La menor le dijo que si podía ir a casa del vecino a llenarla. Como el testigo vio a su cuñado en casa del vecino, le dio permiso.
Al ver que su cuñado le pasó cerca y que la niña ya no estaba en el balcón, salió de su residencia, cruzó la calle y la llamó. El testigo notó que cuando la menor salió traía la ropa mal puesta y lucía nerviosa y temerosa. Le informó a su esposa que chequeara a la menor para ver si había pasado algo. Su esposa le dio conocimiento de lo que le había pasado a la menor. No fue hasta el día siguiente que tuvo conocimiento.
Según el testigo, una vecina vio cuando la menor llenó las gomas y fue entrada hacia arriba. No le informó este hecho a la Policía.
El testigo explicó los pormenores del caso presentado por la violación a la orden de acecho. Él advino en conocimiento cuando la menor le dijo que “ese demonio'”, refiriéndose al apelante, la había amp.na7.arfn con hacerle lo mismo. Nunca había hablado con la menor sobre los hechos.
El apelante no presentó más testigos.
A base de la pruebá desfilada, el Tribunal de Primera Instancia declaró al apelante culpable de los delitos de actos lascivos o impúdicos y restricción de libertad agravada. El apelante fue absuelto por los delitos de tentativa de violación e infracción a la Ley contra el Acecho en Puerto Rico.
El 27 de octubre de 2005, el Tribunal de Primera Instancia impuso al apelante las penas mencionadas.
Insatisfecho, el apelante acudió ante este Tribunal.
III
En su recurso, el apelante plantea que el Tribunal de Primera Instancia erró al declararlo culpable de los delitos de actos lascivos y restricción de libertad agravada a base de una prueba insuficiente que no estableció su culpabilidad más allá de duda razonable. Alega que los testimonios ofrecidos por los testigos de cargo no son confiables.
La Constitución del Estado Libre Asociado de Puerto Rico, según se conoce, consagra en su Art. II, Sección 11, la garantía a todo acusado de un delito de que se le presuma inocente, por lo que es el Estado el que viene obligado a establecer su culpabilidad. Pueblo v. Irizarry, 156 D.P.R. 780, 786 (2002); Pueblo v. González Román, *1156 138 D.P.R. 691, 707 (1995); Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991); véase, además, la Regla 110 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110.
Al Gobierno le corresponde el peso para probar, más allá de duda razonable, los elementos del delito imputado, así como la conexión del acusado con los hechos y la intención o negligencia de éste. Pueblo v. Irizarry, 156 D.P.R. a la pág. 787; Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 99 (2000).
La prueba requerida no sólo tiene que ser suficiente en derecho, sino que debe ser satisfactoria, esto es, capaz de producir “certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido”. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 100; Pueblo v. González Román, 138 D.P.R. a la pág. 707; Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986).
El Tribunal Supremo de Puerto Rico ha aclarado que la duda razonable es aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. Pueblo v. Torres Rivera, 129 D.P.R. 331, 341 (1991). Ello no implica que deba destruirse toda duda posible, sea especulativa o imaginaria, ni que la culpabilidad del acusado tenga que establecerse con certeza matemática. Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995); Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 480 (1992); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 761 (1985). Sólo se exige que la prueba brinde la certeza moral que convence, dirige la inteligencia y satisface la razón. Id.
No obstante, en aquellos casos en que la prueba no establezca la culpabilidad más allá de duda razonable, no puede prevalecer una sentencia condenatoria. Pueblo v. Acevedo Estrada, 150 D.P.R. a las págs. 100-101; Pueblo v. González Román, 138 D.P.R. a la pág. 708; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991).
En tales casos, la revisión de la determinación sobre la culpabilidad del acusado se considera una cuestión de derecho. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 100; Pueblo v. González Román, 138 D.P.R. a la pág. 708; Pueblo v. Cabán Torres, 117 D.P.R. a la pág. 653.
En el caso de autos, según hemos visto, el Tribunal de Primera Instancia declaró al apelante culpable de los delitos de actos lascivos y restricción de libertad agravada, según tipificados en el Código Penal de 1974, vigente a la fecha de los hechos, 33 L.P.R.A. sees. 4067 y 4172.
El Art. 105 del Código Penal de 1974 castigaba, por el delito de actos lascivos o impúdicos, a toda persona que “sin intentar consumar acceso carnal cometiere cualquier acto impúdico o lascivo”. 33 L.P.R.A. sec. 4067; Pueblo v. Rivera Ortiz, 150 D.P.R. 457, 466-467 (2000); Pueblo v. Castro Muñiz, 118 D.P.R. 625, 630-632 (1987); Pueblo v. Romero Cuesta, 101 D.P.R. 404, 414-415 (1973); Pueblo v. Arce Valentín, 88 D.P.R. 859, 861 (1963); cf. 33 L.P.R.A. sec. 4772 (Supl. 2006).
Se trata de actos que tienden a despertar, excitar o satisfacer la impudicia, pasión o deseos sexuales del sujeto activo con otra persona. Pueblo v. Ríos Maldonado, 132 D.P.R. 146, 169 (1992). Véase, Dora Nevares-Muñiz, Código Penal de Puerto Rico, Instituto para el Desarrollo del Derecho, 2000, a la pág. 207.
El Art. 105 consideraba como agravantes, entre otros, que la víctima fuese menor de 14 años de edad y que fuese compelida al acto mediante el empleo de fuerza física irresistible o amenaza de grave o inmediato daño corporal. 33 L.P.R.A. see. 4067; Pueblo v. Castro Muñiz, 118 D.P.R. a las págs. 630-632.
Si la víctima es menor de edad, no se requiere que se establezca la ausencia de su consentimiento o que el delito fue cometido empleando fuerza física. Pueblo v. Castro Muñiz, 118 D.P.R. a la pág. 632, esc. 7.
El Art. 130 del Código Penal de 1974, por su parte, castigaba por el delito de restricción de libertad a “[t]oda *1157 persona que, de cualquier modo, restringiere ilegalmente la libertad de otra, con conocimiento la víctima de la restricción". 33 L.P.R.A. see. 4171; Pueblo v. Robledo, 127 D.P.R. 964, 972 (1991); cf., 33 L.P.R.A. sec. 4795 (Supl. 2006).
En estos casos, el Estado debe probar que la detención de la víctima se ha producido contra su voluntad y que ésta conoce y está consciente de dicha privación. Nevares-Muñiz, supra, a la pág. 264.
El Art. 131 establecía la modalidad agravada del delito cuando, entre otras circunstancias, la víctima fuere menor de 16 años de edad o los actos fuesen cometidos con violencia o intimidación. 33 L.P.R.A. see. 4172; cf., 33 L.P.R.A. sec. 4796 (Supl. 2006).
En el caso de autos, hemos examinado la prueba de cargo y somos de la opinión que ésta es suficiente para sostener la culpabilidad del apelante, más allá de duda razonable.
En efecto, la perjudicada declaró que el apelante le restringió de su libertad sin su consentimiento y que la besó, le mordió un seno y los labios, y le tocó sus partes íntimas. Al momento de los hechos, la niña tenía menos de 14 años de edad.
La versión de la menor fue corroborada por su abuela, quien declaró que había visto las marcas dejadas en el seno y los labios de la menor. Esas marcas también fueron apreciadas por la trabajadora social y por la agente de la Policía. El abuelo de la menor declaró que cuando la niña salió de la casa del apelante traía la ropa mal puesta y lucía nerviosa y temerosa.
A pesar de sufrir un grado de impedimento, la menor fue consistente en los detalles esenciales de su declaración y en la versión ofrecida a las distintas personas que la entrevistaron. No podemos decir que el Tribunal de Primera Instancia hubiera abusado de su discreción al concederle credibilidad.
La norma, según se conoce, es que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, este Tribunal no debe intervenir con la apreciación de la prueba realizada por el juzgador de los hechos. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 99; Pueblo v. Somarriba García, 131 D.P.R. 462, 472 (1992); Pueblo v. Maisonave Rodríguez, 129 D.P.R. a las págs. 62-63; Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 316 (1991).
Debe recordarse que, a diferencia de este Tribunal, el juzgador de instancia tiene la oportunidad de observar y escuchar a los testigos, por lo que goza de una mejor posición para evaluar los testimonios y adjudicar su credibilidad. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 99; Pueblo v. Rosario Reyes, 138 D.P.R. a las págs. 598-599; Pueblo v. Cabán Torres, 117 D.P.R. a las págs. 653-654.
El apelante sostiene que el testimonio de la menor no fue confiable, por lo que no debe sostenerse su convicción. El apelante señala que la menor se contradijo sobre varios aspectos de su testimonio relacionados a la secuencia de los hechos.
Reconocemos que el testimonio de la menor no fue perfecto. Cabe hacer hincapié en que, según la prueba desfilada, la menor padece de un grado de incapacidad, debido a una condición anterior de meningitis, por lo que, a los 13 años de edad, experimentaba dificultad para leer y escribir.
El Tribunal de Primera Instancia, según hemos visto, entendió que no se habían probado los cargos por tentativa de violación e infracción a la Ley de Acecho, a pesar de la declaración de la menor sobre esta porción de los hechos.
*1158 Ello no quiere decir que deba descartarse la totalidad de su testimonio debido a la existencia de inconsistencias y contradicciones. Pueblo v. Chévere Heredia, 139 D.P.R. 1, 15 (1995); Pueblo v. Pagan, Ortiz, 130 D.P.R. a la pág. 483; Pueblo v. Rodríguez Román, 128 D.P.R. a la pág. 129; Pueblo v. Ramos Álvarez, 122 D.P.R. 287, 317 (1988); Pueblo v. Mattel Torres, 121 D.P.R. 600, 609 (1988).
En el presente caso, según hemos señalado, la menor tenía marcas en su cuerpo que tendían a confirmar que había sido objeto de una agresión de naturaleza sexual. Su nerviosidad y conducta con posterioridad a los hechos tiende a conferir sustancia a su alegación de que ella no consintió, lo que, de todos modos, resultaba impertinente porque a la fecha de los hechos ella tenía menos de 14 años de edad. Pueblo v. Castro Muñiz, 118 D.P.R. a la pág. 632, esc. 7.
No creemos que, en estas circunstancias, el Tribunal de Primera Instancia estuviera obligado a rechazar su declaración, la que resulta de otro modo suficiente para sostener la convicción del apelante. Pueblo v. Mejías, 160 D.P.R. _ (2003), 2003 J.T.S. 126, a la pág. 1,336; Pueblo v. Chévere Heredia, 139 D.P.R. a la pág. 15; Pueblo v. Rodríguez Román, 128 D.P.R. a la pág. 128; véase, la Regla 10 de las de Evidencia, 32 L.P.R.A Ap IV, R. 10.
Por los fundamentos expresados, se confirma la sentencia apelada.
Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones