Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>LUIS ALBERTO MIRANDA BURGOS<br><br>Apelante | KLAN202300741 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.:<br>DVI2021G0003<br>DVI2021G0004<br>DVI2021G0005<br>DLA2021G0046<br>DLA2021G0047<br>DLA2021G0048<br><br>Sobre:<br>ART. 93(A) CP 1er GRADO (2 CS)<br>TENT. ART. 93(A) CP 1er GRADO, ART. 6.14 LEY 168 (3 CS) |

Panel integrado por su presidente, el Juez Bermúdez Torres, la Jueza Grana Martínez y el Juez Adames Soto.

Grana Martínez, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 4 de abril de 2024.

El apelante, Luis Alberto Miranda Burgos, solicita que revoquemos la sentencia en la que el Tribunal de Primera Instancia lo encontró culpable de dos delitos de asesinato en primer grado, una tentativa de asesinato y por disparar o apuntar con un arma de fuego. El Procurador General presentó su alegato en oposición al recurso.

El marco jurídico para entender el curso de acción que hoy tomamos se incluye a continuación.

### I.

El Estado presentó tres acusaciones contra el apelante por violación al Art. 6.14 (A) de la Ley Núm. 168 de 2019, que tipifica el delito de disparar o apuntar armas de fuego. Según consta en las acusaciones, el 23 de noviembre de 2020 a las 5:53 pm y en la Calle

Robles Final, Sector Almirantito en Vega Baja, el apelante ilegal a propósito con conocimiento y temerariamente APUNTÓ Y DISPARÓ a TANIA GONZÁLEZ OTERO; PEDRO ENRIQUE COLÓN y MARIBEL OTERO FIGUEROA. Los dos últimos murieron, debido a los disparos recibidos.

El apelante, además, fue acusado por el delito de tentativa de asesinato establecido en el Art. 93 (A) del Código Penal de 2012. Según consta en la acusación, el apelante ilegal, a propósito, con conocimiento, realizó actos inequívocamente dirigidos a ocasionarle la muerte al ser humano TANIA GONZÁLEZ OTERO consistente en que utilizando un arma de fuego mortífera le hiciere varios disparos alcanzándola en el muslo derecho, no logrando la muerte pretendida por causas ajenas a su voluntad.

Por último, el Estado presentó dos acusaciones contra el apelante por el delito de asesinato en primer grado contra PEDRO ENRIQUE ROLÓN y MARIBEL OTERO FIGUEROA. Según consta en las acusaciones, el apelante ilegal, a propósito, con conocimiento, dio muerte a los seres humanos PEDRO ENRIQUE ROLÓN MALDONADO y MARIBEL OTERO FIGUERA: con intención de causársela consistente en que utilizando un arma de fuego mortífera le hiciera varios disparos alcanzándolo en diferentes partes de su cuerpo, lo que le ocasionó la muerte en el acto.

El 21 de julio de 2023, un jurado encontró culpable de forma unánime al apelante por una infracción del delito de tentativa de asesinato, dos infracciones al delito de asesinato en primer grado y las dos violaciones imputadas a la Ley de Armas, *supra.* Fue sentenciado a 129 años de prisión.

El apelante alega que:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR AL APELANTE CULPABLE DE LA COMISIÓN DE LOS DELITOS IMPUTADOS, TODA VEZ QUE EL MINISTERIO PÚBLICO NO PROBÓ, MÁS ALLÁ

DE DUDA RAZONABLE, LA CULPABILIDAD DEL APELANTE.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO APLICAR LA LEY NÚMERO 92 DE 17 DE ABRIL DE 2018, CONOCIDA COMO LA LEY DE LA DOCTRINA DEL CASTILLO Y EXIMIR DE RESPONSABILIDAD PENAL AL APELANTE POR DEFENDERSE LEGITIMAMENTE, A PESAR DE LA CLARA APLICACIÓN A LOS HECHOS.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO APLICAR LA DOCTRINA DE LEGÍTIMA DEFENSA, A PESAR DE LA CLARA APLICACIÓN A LOS HECHOS.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE AL APELANTE, AUN CUANDO HUBO CONTRADICIONES SUSTANCIALES EN LOS TESTIMONIOS DE LOS TESTIGOS DEL MINISTERIO PÚBLICO.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE AL APELANTE, A PESAR DE LOS ERRORES CRASOS EN LAS INVESTIGACIÓN Y LA PATENTE PARCIALIDAD EN LA INVESTIGACIÓN.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR FALLO DE CULPABILIDAD, A PESAR DE QUE EL ESTADO NO PUDO ESTABLECER MÁS ALLÁ DE DUDA RAZONABLE LOS ELEMENTOS CORRESPONDIENTES A CADA UNO DE LOS DELITOS DE ASESINATO EN PRIMER GRADO, SU TENTATIVA ESPECÍFICAMENTE NO SE ESTABLECIÓ LA INTENCIÓN CRIMINAL REQUERIDA.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CUALPABLE AL APELANTE DE LA INCONSISTENCIA ENTRE LA PRUEBA CIENTÍFICA Y LA PRUEBA PRESENTADA POR EL MINISTERIO PÚBLICO.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL APLICAR RETROACTIVAMENTE LA LEY Y LOS PROCESOS CONTRA EL APELANTE, A PESAR DE LA PROHIBICIÓN CONSTITUCIONAL.

## II.

### A. Quantum de prueba

La presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito consagrado constitucionalmente. El Art. II, Sec. 11 de la Constitución del Estado Libre Asociado[1] dispone sobre la presunción que: [e]n todos los

---

[1] LPRA, Tomo 1.

procesos criminales, el acusado disfrutará del derecho a gozar de la presunción de inocencia. La Regla 110 de Procedimiento Criminal abona a explicar que esta presunción opera en todo proceso criminal mientras no se pruebe lo contrario, y en todo caso, de existir duda razonable acerca de su culpabilidad, se le absolverá. *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002); 34 LPRA Ap. II.

En fin, el principio que dirige nuestro ordenamiento sobre la culpabilidad de una persona que ha sido acusada de delito es que se demuestre su culpabilidad con prueba suficiente y más allá de toda duda razonable. Este axioma es inherente con la presunción de inocencia y requisito ineludible del debido proceso de ley. *Pueblo v. Irizarry*, supra; *Pueblo v. De León Martínez*, 132 DPR 746, 764 (1993).

Por tal razón, es el Estado quien tiene el peso de la prueba y, le corresponde presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado. *Pueblo v. Toro Martínez,* 200 DPR 834, 856 (2018); *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.,* 176 DPR 133, 143 (2009). Cuando se impute un asesinato, su trabajo no se limita a probar que un ser humano fue asesinado, ya que tiene que demostrar que fue el acusado quien lo hizo. No obstante, no tiene que establecer la culpabilidad del acusado con certeza matemática. Lo que se exige es prueba satisfactoria y suficiente en derecho. Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido. *Pueblo v. Toro Martínez, supra,* págs. 855-856*; Pueblo v. Rodríguez Román,* 128 DPR 121, 131 (1991); *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 552 (1974). Por otro lado, "duda razonable" no es otra cosa que la insatisfacción de la conciencia del

juzgador con la prueba presentada. *Pueblo v. Irizarry,* supra, pág. 788; *Pueblo v. Rodríguez Román,* supra.

En fin, la determinación de que se incumplió con el quantum de prueba más allá de duda razonable es una cuestión de raciocinio, producto de todos los elementos del juicio del caso. La duda razonable que impide rebatir la presunción de inocencia no es una meramente especulativa o imaginaria o cualquiera posible, se trata de la insatisfacción con la prueba, conocida como duda razonable. *Pueblo v. Toro Martínez, supra,* pág. 856; *Pueblo v. Irizarry,* supra.

Nuestro esquema probatorio este revestido por un manto de deferencia hacia las determinaciones de los juzgadores de primera instancia sobre la prueba testifical ante su consideración. La deferencia está más que justificada, cuando el planteamiento sobre la insuficiencia de la prueba se reduce a la credibilidad de los testigos, porque existe un principio inquebrantable de que es el foro sentenciador el que se encuentra en mejor posición para hacer esa evaluación y adjudicación. *Pueblo v. Toro Martínez, supra,* pág. 857; *Pueblo v. García Colón I,* supra, pág. 165.

El juez sentenciador es ante quien deponen los testigos, tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Pueblo v. García Colón I,* supra. Como regla general, un tribunal revisor tiene vedado intervenir con la adjudicación de credibilidad de los testigos. El foro apelativo no puede sustituir las determinaciones de hecho que el foro primario hizo, luego de escuchar, ponderar, valorar y determinar si cierto testimonio es creíble. La revisión debe estar guiada por parámetros estrictos. Los foros apelativos solo intervendrán y descartarán la credibilidad que el juzgador adjudicó a los testigos, cuando actuó movido por pasión, prejuicio parcialidad

o incurrió en un error manifiesto en su adjudicación. Al revisar una determinación sobre una conducta criminal debemos tener presente que la apreciación de la prueba corresponde al foro sentenciador, salvo que se deba revocar porque surgió de una valoración apasionada, prejuiciada o parcializada, o el dictamen es manifiestamente erróneo. *Pueblo v. Toro Martínez, supra,* págs. 857-858; *Pueblo v. García Colón I,* supra, pág. 166; *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987).

Un juzgador incurre en pasión, prejuicio o parcialidad, cuando actúa movido por inclinaciones personales. Tales motivaciones tienen que llevar al juzgador a adoptar posiciones de preferencia o rechazo hacia las partes o sus causas sin admitir cuestionamientos y sin importar la prueba recibida en sala e incluso sin que se someta prueba alguna. Las conclusiones del foro revisado son erróneas, cuando el foro revisor analiza la totalidad de la prueba y queda convencido de que sus conclusiones confligen con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. El foro primario incurre en un error manifiesto, cuando su apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Pueblo v. Toro Martínez, supra,* pág. 859; *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 782 (2013).

Ahora bien, la base del dictamen no es un asunto de cantidad. Mas bien, responde a un análisis de la credibilidad que otorgó el juzgador de los hechos al o a los testigos que tuvo ante sí. El Estado no tiene que presentar un número específico de testigos para probar la culpabilidad de un acusado más allá de duda razonable. El juzgador tampoco está obligado a decidir de acuerdo con las declaraciones de cualquier cantidad de testigos, si no le convencen frente a un número menor u otra evidencia que le resulte más convincente. *Pueblo v. Toro Martínez, supra,* págs. 859-860.

Sin embargo, el foro revisor se encuentra en igual posición que el tribunal sentenciador para evaluar las conclusiones de hechos fundamentadas en prueba documental o pericial. El Tribunal de Apelaciones tiene la facultad de adoptar su propio criterio en la apreciación y evaluación de la prueba pericial y para descartarla, aunque resulte técnicamente correcta. *Santiago Ortiz v. Real Legacy et al,* 206 DPR 194, 219 (2021).

Por último, la determinación hecha por el juzgador a nivel de instancia, sobre que la culpabilidad del acusado ha quedado probada más allá de duda razonable, es una cuestión revisable como cuestión de derecho. *Pueblo v. González Román,* 138 DPR 691, 708 (1995); *Pueblo v. Cabán Torres,* 117 DPR 645, 653 (1986).

## B. Jurado

En la cúspide de todas las garantías constitucionales que tiene el ciudadano se encuentra el derecho a ser juzgado en todo caso de delito grave por un jurado. El veredicto del Jurado, como la sentencia del juez, es acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia O. E. Resumil Sanfilippo, *Práctica Jurídica de Puerto Rico, Derecho Procesal Penal,* NH, Equity, 1990, Tomo I, pág. 67; *Pueblo v. Figueroa Rosa,* 112 DPR 154, 159 (1982). Su función es dual. Como derecho constitucional, apoya al acusado que será juzgado por otros ciudadanos de su misma condición como garantía de que éstos entenderán en la totalidad de los hechos delictivos usando como patrón la misma escala de valores con que éste mide su realidad. Por otro lado, como juez de los hechos, garantiza una neutralidad en el procedimiento en lo que se refiere a la valoración del hecho por parte del juez, el cual permanecerá como técnico de la norma y operador de la ley. Resumil Sanfilippo, op. cit, pág. 67-68.

El jurado tiene la encomienda principal de ser el juzgador de los hechos. Al jurado le corresponde aquilatar la prueba desfilada y decir si le da crédito. Además, tendrá la última palabra en cuanto a la culpabilidad o inocencia del imputado, establecerá el delito específico y el grado por el cual responderá en caso de que determine su culpabilidad. Su función comprende evaluar la evidencia presentada y admitida por el tribunal durante el juicio y hacer las conclusiones de hechos correspondientes. En fin, es responsable de aplicar el derecho conforme a las instrucciones del juez que preside el proceso y de finalmente emitir el veredicto. *Pueblo v. Negrón Ayala,* 171 DPR 406, 413-414 (2007); *Pueblo v. Bonilla Ortiz,* 123 DPR 434, 439 (1989); *Pueblo v. Cruz Correa,* 121 DPR 270, 277 (1988).

### C. Asesinato en primer grado

El Art. 92 del Código Penal del 2012, 33 LPRA sec. 5141, define el asesinato como el dar muerte a un ser humano a propósito, con conocimiento o temerariamente. Los grados del asesinato están establecidos en el Art. 93, 33 LPRA sec. 5142. Según lo dispuesto en el inciso (a), el asesinato en primer grado se comete cuando la muerte es perpetrada por medio de veneno, acecho, tortura o a propósito o con conocimiento.

Una persona actúa a propósito con relación a un resultado cuando su objetivo consciente es la producción de dicho resultado. Igualmente actúa a propósito con relación a una circunstancia, cuando cree que esa circunstancia existe. Por otro lado, una persona actúa con conocimiento con relación a un resultado, cuando está consciente de que la producción de ese resultado es una consecuencia prácticamente segura de su conducta. Del mismo modo actúa con conocimiento con relación a un elemento de circunstancia, cuando está consciente de que la existencia de esa circunstancia es prácticamente segura. Una persona actúa temerariamente cuando está consciente de que su conducta genera

un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia que la ley prohíbe. Art. 22 del Código Penal de 2012, 33 LPRA sec. 5035(1), (2), (3).

### D. Tentativa

La tentativa está definida en Art. 35 del Código Penal, 33 LPRA sec. 5048. Se configura cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá y sus acciones están inequívocas e inmediatamente dirigidas a la consumación de un delito. No obstante, el delito no se consuma, debido a circunstancias ajenas a su voluntad.

### E. Disparar o apuntar con un arma de fuego

Toda persona que (a) voluntariamente dispare un arma de fuego fuera de los lugares autorizados, por ley, aunque no cause daño a otra o (b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no cause daño a persona alguna, incurrirá en delito grave con pena de reclusión fija de 5 años. No obstante, como excepción, esa norma no aplica en los casos de legítima defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o en actividades legítimas de deporte. La pena cuando existan agravantes podrá aumentarse hasta diez años y reducirse a un año en casos de atenuantes. Toda persona convicta por disparar voluntariamente no tendrá derecho a sentencia suspendida o a disfrutar de los beneficios de programas de desvío, bonificaciones o cualquier alternativa a la reclusión y cumplirá la totalidad de la pena impuesta en años naturales. Art. 6.14 de la Ley Núm. 168 de 2019, 25 LPRA sec. 466(m).

### F. Legítima defensa

Según lo dispuesto en el Art. 25 del Código Penal de 2012, 33 LPRA sec. 5038, no responde penalmente quien defiende su persona, morada, bienes o derechos o los de otros siempre que: (1) las circunstancias le hagan creer razonablemente que ha de sufrir

un daño inminente, (2) haya necesidad racional de usar el medio empleado para impedir o repeler el daño, (3) exista falta de provocación del que ejerce la defensa y (4) no se inflija más daño que el necesario para repeler o evitar el daño. La legítima defensa solo aplica cuando se da muerte a un ser humano, si es razonable creer que el agredido o la persona defendida estaba en inminente o inmediato peligro de muerte o de grave daño corporal. Cuando se invoca para defender la morada, las circunstancias tienen que indicar una penetración ilegal o que la persona que se halla en la morada tenga la creencia razonable de que se cometerá un delito.

Como anticipamos, y de la ley, se desprende que la legítima defensa se trata de una defensa afirmativa que exige la concurrencia de varios requisitos que la propia disposición legal enumera. Es imprescindible, además, que las circunstancias que concurran para justificar la defensa propia deben ser suficientes para excitar el temor de una persona razonable. *Pueblo v. González Román*, 129 DPR 933, 940-941 (1996); *Pueblo v. Morales*, 45 DPR 191 (1933).

Explica la profesora Dora Nevárez Muñiz que la legítima defensa es un eximente de amplia cobertura para justificar el daño a otra persona o a sus bienes cuando la persona, bienes o derechos de quien invoca la defensa, o de un tercero, están bajo ataque o peligro inminente de parte de la persona que provocó la situación. Así también aclara que cualquier bien o interés jurídico propio o de una tercera persona es susceptible de ser defendido dentro del contexto de la legítima defensa. No obstante, la defensa tiene que cumplir con los requisitos de los Arts. 25 y 25a del Código Penal, 33 LPRA secs. 5038 y 5038a. D. Nevárez Muñiz, *Código Penal de PR*, 4ta. ed., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, págs. 52-53.

El daño inminente que justifica la defensa ha de ser uno que lleve a la persona a razonablemente pensar que el daño se va a

producir en el futuro inmediato, o si ya ha comenzado, creer razonablemente que es necesario intervenir para evitar un daño más grave. Ahora bien, la inminencia no es sinónimo de imposibilidad de repeler lo actual. Precisa distinguir los siguientes supuestos. En ciertas ocasiones una agresión ilegítima puede ser un acto súbito e instantáneo que deja un estado de peligro donde, aunque ya la agresión inicial pasó, todavía existe la posibilidad de una agresión posterior que lleve a la persona a pensar que podría estar en necesidad de impedir o repeler ese daño posterior. Si el ataque ya ha pasado y no hay peligro de daño posterior, no puede usarse la defensa para justificar agredir al agresor original. Por otro lado, si el daño se limita a una amenaza verbal, tampoco se justifica la defensa, pues estamos ante una mera provocación. El miedo tampoco constituye la creencia razonable del hombre prudente que está en inminente peligro de muerte o de sufrir grave daño. *Íd.*

La racionalidad del medio empleado para defender las personas, bienes o derechos sea el apropiado para impedir el daño. A tales efectos, habrá que considerar los siguientes elementos: la gravedad del ataque; naturaleza e importancia del bien jurídico tutelado, condiciones personales de las partes, naturaleza del medio empleado, que el medio empleado sea apropiado con relación al tipo o gravedad del ataque, así como también con relación a la calidad del bien defendido. La magnitud de la agresión, aunque varía conforme las circunstancias, no puede ser tal que inflija daño mayor a la persona que el que se pretende evitar; y, tampoco puede estar fuera de proporción con la provocación que se ha presentado. *Íd.*

Sobre la falta de provocación de quien propone la defensa de que quien originalmente provoca un ataque, no debe luego beneficiarse de la defensa para repelerlo. La provocación de la persona que recibe el daño ha de ser suficiente para que pueda ejercerse la defensa. Además, ya hemos dicho que no debe infligirse

más daño que el necesario para repeler la agresión o impedir el daño inminente. Tal consideración exige evaluar la proporcionalidad entre el daño causado por el que invoca la defensa frente al que trata de impedir. La jurisprudencia ha reconocido que este requisito, no requiere que el agredido tenga que huir, esconderse o abandonar el sitio, previo a tener disponible la defensa. *Pueblo v. De Jesús Santana,* 100 DPR 791, 798 (1972); *Pueblo v. Iturrino De Jesús,* 90 DPR 706, 711 (1964). Inclusive, el agredido, además de lograr su defensa, puede perseguir al atacante si ese curso de acción es indispensable para salvar su vida. Ahora bien, si el peligro cesa, la agresión no se justifica. *Pueblo v. Gonzalez Román,* 129 DPR 933, 941 (1996).

**G. Doctrina del Castillo** "**Castle Doctrine", Ley Núm. 92-2018**

El Art. 25 A del Código Penal, 33 LPRA sec. 5038 a (1) (A), (c) (1) (A), establece la presunción razonable de que se está en riesgo de sufrir un daño inminente a la integridad corporal, cuando alguien penetra ilegalmente a la morada. No obstante, para que prospere esa defensa, no puede haber provocación del actor y el medio empleado y el daño ocasionado tiene que ser racional. Al causarle la muerte a un ser humano, es necesario que el actor tenga la creencia de la existencia de un inminente peligro o inmediato peligro de muerte o de grave daño corporal. Cuando la muerte se produjo en defensa a la morada, es necesario que el actor haya sabido o haya tenido razón para creer, que la persona a quien le causó la muerte penetró o intentaba penetrar ilegalmente en el interior de la morada.

Este artículo establece una presunción controvertible a favor de la razonabilidad de los actos de la persona que invoca la defensa cuando la persona agredida o muerta: a) penetró o intentaba penetrar ilegalmente al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por quien invoca la defensa, o la persona a quien protege; y, o b) secuestró o intentó

secuestrar a quien invoca la defensa o a alguna otra persona, del interior de la morada, vehículo, lugar de negocios o empleo del actor o la persona a quien el actor protege. En esta situación, la carga de la prueba revierte al fiscal, quien tendrá que demostrar que la presunción de razonabilidad no le asiste a quien invoca la defensa. Nevárez Muñiz, op. cit., págs. 53-54.

**III**

El apelante cuestiona en los señalamientos de error 1, 4 y 6 de la apreciación de la prueba y adjudicación de credibilidad del foro sentenciador. Por esa razón, los discutiremos conjuntamente.

Su representación legal alega en el primer señalamiento de error que no se probó su culpabilidad más allá de duda razonable, en el cuarto señalamiento de error, que los testigos del Ministerio Público incurrieron en contradicciones sustanciales y en el sexto señalamiento de error, que no se pasó prueba sobre todos los elementos de los delitos de asesinato y de tentativa de asesinato.

El señor Miranda Burgos argumenta que las víctimas fueron temerarias porque propiciaron una confrontación y se prepararon y armaron para atacarlo. Por otro lado, aduce que las declaraciones de la hija de los occisos sobre el objeto que tenía en sus manos son ambivalentes y que en el video se ve que era algo similar a un arma, pero nunca se investigó al respecto. Además, sostiene que en el video se ve que él estaba retrocediendo y caminando de espalda. Su representación legal argumenta que no se probó la intención de asesinar, porque el apelante pudo matarlos antes de que abrieran el portón. Sin embargo, no es hasta que lo acorralan y lo atacan con un cuchillo, que el apelante saca el arma como advertencia, pero no la utiliza. El apelante sostiene que disparó porque escuchó a la nieta de los occisos decirle a su madre que buscara su arma y la vio con algo similar a un arma en sus manos. Por último, arguye que bajó el arma, luego del primer disparo, pero volvió a utilizarla, porque

continuaron gritando y avanzando amenazantemente al punto de agredirlo.

El TPI no cometió los errores 1, 4 y 6. El Ministerio Público demostró más allá de duda de razonable que el apelante cometió los delitos de asesinato en primer grado contra Pedro Enrique Rolón y Maribel Otero Figueroa, y de tentativa de asesinato contra, Tanya González Otero, porque probó todos sus elementos y su relación con el imputado.

Los testigos del Ministerio Público nos dejan claro que el apelante actuó con pleno conocimiento de que su conducta ocasionaría la muerte de Pedro Enrique Rolón y Maribel Otero Figueroa porque les disparó y remató mientras estaban en el suelo. El hecho de dispararles en el suelo hace obvio que el apelante tenía pleno conocimiento de que la muerte de ambos era una consecuencia prácticamente segura de su conducta. Igualmente quedó demostrado que el apelante cometió el delito de tentativa de asesinato en primer grado contra Tanya González Otero. El apelante la siguió, apuntó, disparó e hirió con un arma de fuego, mientras ella intentaba huir. El hecho de perseguirla y dispararle hace obvio que el apelante tenía pleno conocimiento de que la muerte era una consecuencia prácticamente segura de su conducta. No obstante, el asesinato no se consumó, por razones ajenas al apelante.

La prueba del Estado incluyó los testimonios de tres testigos oculares. Tanya González Otero declaró que vio a su padre caer en el suelo, luego de recibir el primer disparo y al apelante dispararle a su madre, mientras estaba tirada en el suelo. La testigo observó al apelante levantar su camisa y sacar una pistola negra. Ella comenzó a gritar que el apelante sacó una pistola. Tanya González Otero vio al apelante apuntándole a su papá y a su mamá en medio de ambos. Igualmente observó cuando el apelante le dio un disparo a su papá y a este agarrarse el cuello y la cabeza y caer al piso. La testigo vio

a su mamá agarrarse la cabeza, ñangotarse, tirarse al piso y al apelante dispararle. Véase, pág. 189 de la Transcripción. Fue enfática en que, al momento de disparar, el apelante se mostraba seguro, en control y dominio de sí mismo. La testigo dijo que observó cuando el apelante levantó su camisa y sacó el arma. Véase, pág. 228 de la Transcripción.

Otra de los testigos del Ministerio Público es Tanya Liz Díaz González, nieta de los fallecidos e hija de Tanya González Otero. Su testimonio confirmó que su abuelo cayó al piso, luego de recibir el primer disparo y que su abuela se arrodilló junto a él. La nieta vio cuando el apelante le disparó a su abuela en el suelo y escuchó que hizo varios disparos, mientras ella también estaba tirada en el piso. Sus declaraciones son las siguientes. Ella vio al apelante quitando unos alambres y unas rejas puestas en un portón para que el perro no saliera. Véase, pág. 416 de la Transcripción. Su abuela le dijo que dejara eso así, porque a él no le molestaba. El apelante entró a su casa. Sus abuelos, su mamá y ella bajaron hasta el portón. El apelante se paró frente al portón, le dijo a su abuelo que lo abriera y lo invitó a pelear. Su abuelo abrió el portón. Ella comenzó a grabar con su celular. El apelante continuó invitando a su abuelo a pelear, luego de que se abrió el portón. Los dos empezaron a frontear. Su abuela estaba en medio de ambos. De momento, el apelante sacó el arma, le apuntó a su abuelo y le disparó. Su abuelo cayó al piso. Su abuela se arrodilló dónde estaba su abuelo. El apelante le disparó a su abuela mientras estaba arrodillada. Ella también se tiró al piso, cuando vio al apelante dispararle a su abuela. Durante el tiempo que estuvo en el piso escuchó varios disparos. Cuando levantó la vista vio a su mamá corriendo y al apelante detrás de ella. Se paró y vio a su abuela botando sangre por la boca. El apelante le apuntó con la pistola y le pidió el celular. Ella se fue corriendo a casa de su

vecino Santos y llamaron al 911. Véase, págs. 419-420 de la Transcripción.

Adalberto Santos Sánchez fue enfático en que vio al apelante disparándole a Pedro Enrique Rolón y a Maribel Otero Figueroa mientras estaban en el piso. El testigo es vecino del apelante y de las víctimas y presenció los hechos. El señor Santos declaró que escuchó una discusión entre el apelante y Pello y los vio yéndose a las manos. Él fue caminando rápido y gritándole a Pello con la intención de apaciguar los ánimos. Sin embargo, no le dio tiempo a llegar, porque el apelante se echó para atrás, sacó la pistola de su cintura y le disparó a Pello y a Maribel. Cuando vio la acción del apelante, retrocedió hasta su casa y buscó su pistola. La nieta de los occisos llegó a su residencia cuando iba de salida y llamaron al 911. Véase, págs. 598 y 600 de la Transcripción. Durante el contrainterrogatorio dijo que vio al apelante sacar el arma y disparar, mientras él estaba a unos 60 o 70 pies de distancia. Véase, pág. 616 de la Transcripción. Adalberto Santos repitió que vio al apelante rematar a las víctimas en el piso. Véase, pág. 629 de la Transcripción.

El investigador forense Jonathan Ortiz Arroyo declaró que la occisa recibió cuatro impactos de bala, tres en la parte frontal del cuerpo, dos de ellos en el rostro y un cuarto en un dedo y que el occiso recibió tres heridas por la espalda. Véase, págs. 537-538 de la Transcripción.

Según el testimonio del patólogo forense, Francisco Javier Dávila Toro, ninguno de los disparos que recibieron los occisos fueron de contactos, ni a menos de seis pies de distancia, porque las heridas no tenían negro de humo, tatuaje de pólvora ni impresión de arma. Dávila Toro explicó que la existencia de tatuaje de pólvora significa que la distancia de la punta del arma hasta la superficie corporal donde está la quemadura puede ser de seis pies o menos.

Véase, pág. 917 de la Transcripción. Además, explicó que el hallazgo de impresión de arma y negro de humo significa que la herida es de contacto. Véase, págs. 1029, 1030 y 1034 de la Transcripción. La opinión pericial nos lleva a concluir que las víctimas no estaban a una proximidad que pusiera en riesgo inminente la seguridad y vida del apelante. El patólogo aportó el dato importante de que la cabeza de la occisa estaba por debajo del arma, al momento de recibir los disparos. A nuestro juicio, eso es cónsono con que estaba tirada en el suelo.

Su testimonio fue el siguiente. La occisa recibió la herida de bala A a 5 pulgadas por debajo del tope de la cabeza y a tres pulgadas y media a la derecha de la línea media corporal anterior de la cara (mejilla derecha). La herida tiene un anillo de abrasión, no presenta negro de humo, tatuaje de pólvora ni impresión arma. Según el perito, estas son características que se utilizan para determinar la distancia entre la punta del arma y la superficie corporal del occiso. El proyectil hizo daño dentro del cráneo y entró por el rostro en el pómulo derecho. Véase, págs. 909-910 de la Transcripción. La herida de bala B es irregular y está a 5 pulgadas por debajo del tope de la cabeza y a un cuarto de pulgada a la derecha de la línea media anterior de la cara, en la región del orificio nasal derecho. Esta herida presentó un anillo de abrasión, pero no presentó negro de humo, ni tatuaje de pólvora, ni impresión de arma. Véase, pág. 911 de la Transcripción. La herida de bala C estaba a 45 pulgadas sobre el talón y a 10 pulgadas a la izquierda de la línea media corporal posterior del inferior de la espalda y en el lado izquierdo. Esta herida presentó anillo de abrasión, pero no tenía negro de humo, ni impresión de arma. El disparo entró a la cavidad abdominal a través del espacio intercostal y laceró el hígado. Véase, págs. 913-915 de la Transcripción.

El perito dijo que las heridas lesionaron los órganos vitales del cerebro y el hígado de la occisa. Véase, pág. 925 de la Transcripción. Según el perito, la occisa recibió los disparos mientras su cabeza estaba por debajo del arma de fuego. Véase, pág. 930 de la Transcripción.

El doctor Francisco Javier Dávila Toro declaró que la herida A del occiso presentó anillo de abrasión, pero no presentó negro de humo, tatuaje de pólvora ni impresión de arma. Véase, pág. 947 de la Transcripción. Según surge de su testimonio, la herida A fue ocasionada en la parte media de la espalda por el lado izquierdo. Véase, págs. 948-949 de la Transcripción. El perito dijo que la herida B del occiso presentó anillo de abrasión, pero no presentó negro de humo, tatuaje de pólvora ni impresión de arma. Véase, pág. 950 de la Transcripción. El perito explicó que la herida B fue por encima de la clavícula del lado izquierdo. Véase, pág. 951. Según el perito, esta herida fue más o menos en la región de la espalda superior, con una trayectoria de adelante hacia atrás y un poco hacia la izquierda. Véase, pág. 952 de la Transcripción. El doctor Dávila Toro identificó la herida C en la región del costado derecho. Véase, pág. 953 de la Transcripción. El perito declaró que la herida C presentó anillo de abrasión, pero no presentó negro de humo, tatuaje de pólvora ni impresión de arma. Véase, pág. 954 de la Transcripción. Además, dijo que la herida C, a diferencia de las A y B, lesionó un órgano vital que es el hígado. Véase, pág. 956 de la Transcripción. Su conclusión es que la causa de la muerte son heridas de bala y que la manera de muerte es homicidio. Véase, pág. 960 de la Transcripción.

El agente Carlos Rivera declaró que las fotos del video confirman la versión de la nieta, de que el apelante continuó disparándole a su abuela mientras estaba ñangotada. Véase, pág. 1114 de la Transcripción. Según el agente, el señor Santos le dijo

que vio al apelante rematar a las personas en el piso. Véase, pág. 1063 de la Transcripción.

El agente vio en el video al apelante cuando sacó el arma de fuego y a las víctimas dejar de moverse. El testigo no observó al occiso con nada en la mano, cuando el apelante hizo el primer disparo. Véase, págs. 1405-1406 de la Transcripción. Su testimonio confirmó que la occisa tenía una herida en el dedo pulgar. A nuestro juicio, eso es compatible con que estaba indefensa e intentó protegerse con las manos. El testigo también declaró que el occiso recibió los disparos por la espalda. Véase, pág. 1118 de la Transcripción.

El Ministerio Público, además, demostró más allá de duda razonable que el apelante cometió el delito de tentativa de asesinato contra Tanya González Otero. La señora González Otero declaró que salió corriendo a buscar su arma de fuego, luego de que el apelante disparó a sus padres. La testigo dijo que, en ese momento, temió por su vida. Cuando miró hacia atrás vio al apelante persiguiéndola y apuntándole con la pistola. La señora González Otero recibió un disparo en el muslo derecho. Aunque intentó bajar nuevamente a donde estaban sus padres, no pudo porque el apelante estaba velándola y la señalaba con la pistola. Véase, págs. 190-191 de la Transcripción. Cuando regresó del hospital verificó las cámaras de seguridad y observó al apelante detrás de ella apuntándole y disparándole y le tomó unos *screen shots*. Véase, págs. 195-196 de la Transcripción. Tanya Liz confirmó que vio al apelante persiguiendo a su madre con la pistola. Véase, pág. 419 de la Transcripción.

La prueba presentada nos convence de que el apelante actuó con el propósito de asesinar a Tanya González Otero, porque la persiguió y le disparó con un arma de fuego y le ocasionó una herida en el muslo derecho. Nos queda claro que sus actos estaban

dirigidos a consumar el asesinato. El delito no se consumó, debido a circunstancias ajenas a su voluntad. La víctima salió corriendo y pudo escaparse.

El apelante intenta establecer infructuosamente que temió por su vida porque la occisa tenía piedras en sus manos, el occiso, una cuchilla y Tanya González Otero, un objeto que parecía una pistola y que escuchó a la hija de esta decirle que buscara el arma. Sin embargo, ninguna de las razones que aduce justifica que disparara y rematara a las víctimas, mientras estaban en el suelo. Tampoco justifica que persiguiera a la señora González Otero con el arma de fuego, le apuntara y disparara y la hiriera, mientras ella corría para protegerse. A diferencia de lo que alega el apelante es él a quien se ve persiguiéndola. La víctima en ningún momento repelió el ataque con un arma de fuego. Los testimonios y la prueba no controvertida evidencian que fue el apelante quien fue detrás de la víctima para asesinarla y que esta solo huyó para evitarlo.

La representación legal del apelante invoca en el tercer señalamiento de error la aplicación de la doctrina de legítima defensa.

La legítima defensa no prospera por razones obvias. El apelante le disparó a las víctimas mientras estaban indefensas y tiradas en el suelo y se encontraban a más de 6 pies de distancia. La legítima defensa no se justifica, porque en esas circunstancias, los occisos no representaban un inminente peligro de muerte o grave daño corporal para el apelante. La defensa del castillo, invocada en el segundo señalamiento de error, no aplica por los mismos fundamentos. El apelante no se encontraba en riesgo de sufrir un daño inminente en el momento en que les disparó y le causó la muerte a las víctimas. Tampoco existe evidencia de que las víctimas invadieran su morada. Tanya González Otero declaró que sus padres cayeron de 5 a 6 pies de distancia del portón de entrada de la casa

del apelante. Véase, pág. 389 de la Transcripción. Tanya Liz dijo que el incidente ocurrió entre los dos portones en referencia al portón del camino y de la entrada de la residencia del apelante. Véase, pág. 467 de la Transcripción. Adalberto Santos dijo que los cuerpos quedaron frente al portón de la residencia del apelante. Véase, pág. 617 de la Transcripción.

La defensa propia tampoco puede prosperar respecto a Tanya González Otero porque, como advertimos previamente, es el apelante quien corre detrás de ella y le dispara con un arma para asesinarla. La víctima en ningún momento sacó ni utilizó un arma de fuego, simplemente huyó para protegerse.

El apelante en el cuarto señalamiento de error atribuye parcialidad al agente Carlos Rivera. Según su representación legal, el agente declaró que todo el mundo tiene derecho a defender su vida, menos el apelante. Véase, pág. 1388 de la Transcripción. Rivera no incurrió en parcialidad alguna, porque nunca hizo esas expresiones. La representación del apelante legal tergiversa su testimonio que fue el siguiente:

> P. Tanya tiene derecho a defender a su familia, ¿verdad que sí?
>
> R. Todo el mundo tiene derecho a defender a su familia.
>
> P. ¿El acusado tiene derecho a defender a su familia?
>
> R. Depende de los elementos.
>
> P. ¿O sea, que todo el mundo tiene derecho, pero el acusado depende de los elementos?, ¿esa es la contestación?
>
> R. Todas las personas tienen derecho a defenderse.
>
> P. Todas las personas tienen derecho a defenderse.
>
> R. Y eso es un derecho constitucional, todo el mundo tiene derecho a defenderse, claro que sí.

La representación legal del apelante aduce incorrectamente que el agente admitió que hace caso omiso a los procesos. Véase, pág. 1126 de la Transcripción. Su testimonio fue el siguiente:

P. Cómo se debe actuar en ciertas circunstancias. Y eso tiene el peso de una ley, ¿verdad?, ¿las órdenes generales.?

R. No.

P. A su entender no tiene peso de ley.

R. No, un peso de peso de ley, la ley va por encima de cualquier orden general.

P. Claro. Pero también, verdad, la ley aunque va por encima, el regla... los reglamentos, verdad, de la Policía, también hay que cumplirlo como si fueran ley.

R. Es un formato para trabajo, sí, pero por encima de la ley no van.

P. No, no van por encima de la ley, pero hay que cumplirlas como si fuera la ley.

R. Bueno, hay que llevar un...

P. ¿No hay que cumplirlo es lo que...?

R. Hay que cumplirlo en la investigación, sí, claro que sí.

Por otro lado, el apelante cuestiona que el investigador forense, Jonathan Ortiz Anaya, permitió personas ajenas en la escena y con interés en el caso. Véase, pág. 563 de la Transcripción. Su representación legal se refirió a las declaraciones siguientes:

P. Le pregunto si usted puede decirle al jurado quién es esa persona que usted puede ver en esa foto.

R. No, no sé quién es.

...

P. Le pregunto si se trata... ¿Y qué usted puede ver ahí en esa foto?

R. A una fémina.

P. Le pregunto si usted puede distinguir qué tiene esa fémina en las manos.

R. No, no puedo distinguir.

P. Tiene algo como amarillo, ¿verdad?

R. Como algo amarillo, sí, pero no se puede ver más...

P. Le pregunto si ese es del mismo amarillo de los conitos que usted tiene por ahí, que usted usa para marcar la evidencia.

R. No es el mismo.

P. ¿No es el mismo?

R. No.

P. Y le pregunto si esa fue... es la persona que usted dice que estuvo en el área de la escena.

R. Siempre estuvo en esa área, al frente de la residencia, sí.

P. Que eso era todavía más arriba a estas manchas de sangre...

R. Hay manchas de...

P. ...y ahí justamente frente a donde ella está.

R. Hay otra mancha.

Del testimonio del agente Rivera no puede concluirse que la persona a la que hace referencia el apelante tenga un interés en el caso, ni de que haya alterado la escena. Su presencia en nada afecta el valor de los testimonios presentados en corte que están apoyados por el video admitido en evidencia.

El apelante cuestiona que el cuchillo que alega tenía el occiso y las piedras que también alega tenía la occisa, no fueron recogidas como evidencia en la escena. La agente Yahaira Robles Torres declaró que la cuchilla se encontró en uno de los bolsillos del occiso y estaba cerrada. Véase, pág. 47 de la Transcripción. La testigo dijo que Alberto Santos y ninguno de los otros testigos, le informaron que Maribel tenía una piedra en la mano, ni que el occiso sacó una cuchilla. Véase, pág. 69 de la Transcripción. El Agente Anthony Ríos Caballero confirmó que nadie le dijo que el apelante fue atacado con un cuchillo. Véase, pág. 152 de la Transcripción. El patólogo forense dijo que era muy poco probable que el occiso estuviera empuñando un objeto en sus manos, porque en el momento de la muerte ocurre un relajamiento muscular que después se convierte en rigor mortis. Véase, pág. 967 de la Transcripción.

El investigador de Ciencias Forenses dijo que no le dio relevancia a la cuchilla, porque estaba cerrada en el bolsillo del

occiso y no tenía ninguna mancha de aparente sangre. Véase, págs. 542, 557 y 560 de la Transcripción. No obstante, hizo constar su hallazgo en el informe. Véase, pág. 585 de la Transcripción. Fue enfático en que no levantó la cuchilla como evidencia, porque no tenía información de que hubiese sido utilizada. Véase, pág. 586 de la Transcripción. El testigo declaró que nadie le dio información de que la occisa utilizó las piedras porque, de lo contrario, las hubiera levantado. Véase, págs. 588-589 de la Transcripción.

La hija de la occisa reconoció que en el video se ve a su madre tirar una piedra que cayó frente al apelante y a su padre metiendo la mano en el bolsillo. Véase, págs. 326-327 y 337 de la Transcripción. No obstante, Adalberto Santos dijo que ninguno de los occisos tenía nada en las manos. Véase, págs. 620-621 de la Transcripción.

El agente Carlos Rivera explicó que el hallazgo de la cuchilla no afectó el resultado de su investigación, porque el occiso no la tenía en las manos, cuando recibió los disparos. Según el agente, la cuchilla estaba en el bolsillo del occiso. Véase, pág. 1104 de la Transcripción. Además, dijo que la occisa siempre estuvo en medio del apelante y del occiso. Aunque reconoció que se escucha al apelante decir ah con cuchilla, dijo que no podía verse en el video. Véase, págs. 1167-1168 de la Transcripción. Por último, declaró que en el video se ve al apelante sacar el arma de fuego, las víctimas dejándose de mover y que el occiso no tenía nada en la mano cuando el apelante hizo el primer disparo. Véase, págs. 1405-1406 de la Transcripción.

A nuestro juicio, la existencia de la cuchilla en el bolsillo del pantalón del occiso y las piedras encontradas al lado de la occisa, no derrotan el valor probatorio de los testimonios que evidencian que el apelante asesinó a Pedro Enrique Rolón y Maribel Otero Figueroa, mientras estaban indefensos y tirados en el suelo. El video

admitido en evidencia, únicamente confirma la veracidad de sus testimonios.

El apelante alega en el séptimo señalamiento de error que su prueba científica controvirtió la evidencia del Ministerio Público. Su representación legal se refiere al testimonio de la Dra. Arlene Rivera Mass, médico psiquiatra con subespecialidad en psiquiatría forense. La perito declaró que el apelante tuvo una reacción de lucha huida. Según la perito, esa reacción ocurre cuando el ser humano se siente atacado y recibe una alerta en su cerebro de que está en peligro y tiene que pelear o salir corriendo. Véase, pág. 1541 de la Transcripción. Luego de ver el video concluyó que el apelante se sintió acorralado, porque varias personas lo estaban confrontando. Véase, págs. 1557 y 1580 de la Transcripción. Según la testigo, en el video se observa al acusado dando pasos hacia atrás para protegerse y a otras personas siguiéndolo y se escucha a otra decir, mira un arma, busca la tuya. La Dra. Rivera Mass describió la situación en la que se encontraba el apelante como una de peligro. Véase, pág. 1562 de la Transcripción. La perito concluyó que aplica la situación de lucha huida, debido a que vio una persona en retirada y otras que se están cercando y un aparente peligro inminente. Véase, pág. 1567 de la Transcripción.

El TPI no cometió el séptimo señalamiento de error. El testimonio de la Dra. Rivera Mass, no controvirtió la prueba del Ministerio Público, porque nunca entrevistó ni evaluó al apelante, a pesar de que estuvo ante su disposición. Véase, págs. 1564 y 1588 de la Trascripción.

Por último, el apelante alega que el TPI erró al aplicar retroactivamente la ley y los procesos, a pesar de la prohibición constitucional. El apelante se refiere a la aplicación retroactiva de la establecida en norma establecida en *Pueblo v. Centeno,* 2021 TSPR 133, sobre el veredicto de unanimidad del jurado.

El TPI no cometió el octavo señalamiento de error. La controversia ya fue atendida y resuelta mediante sentencia por este tribunal, el 19 de mayo de 2022 en el recurso KLCE202200284. Allí el Procurador General cuestionó que la juez de instancia se negó a aplicar el precedente de *Pueblo v. Centeno,* supra, que exige la unanimidad del jurado para encontrar al acusado no culpable, por la comisión de delitos imputados. La jueza de instancia concluyó que la aplicación de ese precedente laceraba los derechos fundamentales del acusado. Inconforme con la decisión, el Procurador General presentó el recurso KLCE202200284 en que alegó que:

> El Tribunal de Primera Instancia incurrió en un patente error de derecho y craso abuso de discreción al ignorar la norma de unanimidad para todo veredicto establecida por el Tribunal Supremo de Puerto Rico en *Pueblo v. Centeno,* 2021 TSPR 133, 207 DPR ___ (2021), y concluir que el Jurado puede rendir su veredicto de no culpabilidad por mayoría de votos en que deberán concurrir no menos de nueve.

El 19 de mayo de 2022 expedimos el recurso y revocamos al foro primario, porque el Tribunal Supremo de Puerto Rico resolvió en *Pueblo v. Centeno,* supra, que el veredicto de absolución tiene que ser unánime y aplicó la decisión retroactivamente porque le ordenó al TPI a dar esa instrucción al jurado. Las partes recurrieron al Tribunal Supremo de nuestra determinación. El 12 de septiembre de 2022 este declaró no ha lugar la petición de certiorari. La decisión dictada en una sentencia que advino final y firme no puede ser cuestionada.

El jurado imparcial que escuchó y vio los testigos declarar adjudicó credibilidad a los testimonios del Ministerio Público y determinó un veredicto de culpabilidad. Todos los testigos oculares del Ministerio Público coinciden en que el apelante le disparó hasta ocasionarles la muerte a Pedro Enrique Rolón y Maribel Otero Figueroa. El investigador forense declaró que el occiso recibió los

tiros por la espalda. El patólogo forense dijo que la occisa recibió los disparos, mientras su cabeza estaba por debajo del arma de fuego. El agente Carlos Rivera dijo que el video presentado en evidencia confirma la versión de que el apelante le disparó a las víctimas mientras que estaban en el suelo y que el señor le confirmó que los remató en el suelo. El jurado también quedó convencido de que el apelante cometió el delito de tentativa de asesinato contra Tanya González Otero, porque la persiguió, le disparó e hirió con un arma de fuego, mientras la víctima estaba desarmada y huía para evitar ser asesinada. Los testimonios de los testigos del Estado no fueron controvertidos por la defensa y la imparcialidad del jurado y del TPI no ha sido lesionada. La ausencia de evidencia de una valoración apasionada, prejuiciada o parcializada o que el dictamen es manifiestamente erróneo, nos obliga a honrar la deferencia del foro que evaluó la prueba de primera mano.

**IV**

Por lo antes expuesto, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones